Citation Nr: 1826264 
Decision Date: 04/30/18 Archive Date: 05/07/18

DOCKET NO. 09-38 086 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in Waco, Texas


THE ISSUES

1. Entitlement to service connection for macular degeneration, including as secondary to service-connected diabetes mellitus, type II (diabetes).

2. Entitlement to service connection for hypertension.

3. Entitlement to service connection for a skin disorder, claimed as pseudofolliculitis barbae (PFB) with stasis dermatitis,

4. Entitlement to service connection for a right knee disability.

5. Entitlement to service connection for a left knee disability.

6. Entitlement to service connection for a low back disability.

7. Entitlement to an initial rating in excess of 20 percent for diabetes.

8. Entitlement to a separate initial compensable rating for onychomycosis, secondary to service-connected diabetes.

9. Entitlement to a separate initial compensable rating for a bilateral cataracts disability, secondary to service-connected diabetes mellitus.

10. Entitlement to a separate initial compensable rating for erectile dysfunction, secondary to service-connected diabetes mellitus.

11. Entitlement to an initial rating in excess of 30 percent for cystoparesis prior to December 7, 2016, and in excess of 40 percent thereafter.

12. Entitlement to an initial rating in excess of 10 percent for right lower extremity peripheral neuropathy prior to April 22, 2015, and in excess of 20 percent thereafter, including whether an earlier effective date is warranted for the award of the 20 percent rating.

13. Entitlement to a rating in excess of 10 percent for left lower extremity peripheral neuropathy prior to April 22, 2015, and in excess of 20 percent thereafter, including whether an earlier effective date is warranted for the award of the 20 percent rating.

14. Entitlement to an effective date prior to May 30, 2006 for the award of service connection for diabetes.

15. Entitlement to special monthly compensation (SMC) based on the Veteran's spouse's need for regular aid and attendance (A&A).


REPRESENTATION

Appellant represented by: Lori Chism, Attorney-at-Law


ATTORNEY FOR THE BOARD

M. Thomas, Associate Counsel



INTRODUCTION

The Veteran, who is the appellant in this case, served on active duty from May 1968 to December 1969.

This matter comes before the Board of Veterans' Appeals (Board) on appeal from multiple rating decisions from Department of Veterans Affairs (VA) Regional Offices (RO). Jurisdiction currently resides with the VA RO in Waco, Texas.

In January 2007, the VA RO in New Orleans, Louisiana, in pertinent part, denied entitlement to service connection for hypertension, macular edema, and PFB. 

In December 2007, the VA RO in New Orleans, Louisiana, in pertinent part, granted service connection for diabetes and assigned a 20 percent initial rating, effective May 30, 2006.

In January 2010, the VA RO in Houston, Texas, granted service connection for onychomycosis and assigned a noncompensable initial rating, effective September 28, 2007.

In May 2014, the VA RO in New Orleans, Louisiana, in pertinent part, denied entitlement to service connection for a low back disability and SMC based on the Veteran's spouse's need for A&A. 

In May 2015, the VA Evidence Intake Center in Janesville, Wisconsin, denied entitlement to total disability rating based on individual unemployability (TDIU). The Board notes that in Rice v. Shinseki, the United States Court of Appeals for Veterans Claims (Court) held that entitlement to a TDIU is a part of an increased rating issue when such claim is raised by the Veteran or reasonably raised by the record. Rice v. Shinseki, 22 Vet. App. 447 (2009). However, in this case, the Board previously found in the October 2016 remand that the issue of entitlement to a TDIU is not properly before the Board at this time, because the Veteran did not submit a timely notice of disagreement to the May 2015 rating decision. Furthermore, no new and non-duplicative evidence has been added to the record since October 2016 that would give rise to a claim of entitlement to a TDIU. Therefore, the issue of entitlement to a TDIU is not part of the increased rating issues that are currently on appeal.

In January 2016, the VA RO in Waco, Texas, in pertinent part, awarded service connection for bilateral cataracts (rated noncompensable, effective October 4, 2011), erectile dysfunction (rated noncompensable, effective May 30, 2006), right and left lower extremity peripheral neuropathy (each rated 10 percent disabling, effective May 30, 2006, and increased to 20 percent disabling from April 22, 2015), and cystoparesis, claimed as bladder dysfunction, (rated 30 percent disabling, effective May 30, 2006).

In October 2016, the Board, in pertinent part, remanded the issues on appeal for additional development. There has been substantial compliance with the Board's remand directives. Stegall v. West, 11 Vet. App. 268 (1998) (finding that a remand by the Board confers on the Veteran the right to compliance with its remand orders).

In February 2016, the RO increased the rating for cystoparesis from 30 percent to 40 percent, effective December 7, 2016. Because less than the maximum available benefits were awarded, the increased rating claim remains before the Board. See Fenderson v. West, 12 Vet. App. 119, 126 (1999); AB v. Brown, 6 Vet. App. 35 (1993).

The Veteran most recently appointed Lori Chism, Attorney-at-Law, as his representative, thereby revoking all prior representatives.

After reviewing the contentions and evidence of record, the Board finds that the issues on appeal are accurately stated as listed on the title page of this decision. See Brokowski v. Shinseki, 23 Vet. App. 79 (2009) (holding that a claimant may satisfy the requirement to identify the benefit sought by referring to a body part or system that is disabled or by describing symptoms of the disability); see also Clemons v. Shinseki, 23 Vet. App. 1, 5 (2009) (holding that the scope of a mental health disability claim includes any mental disorder that may reasonably be encompassed by the claimant's description of the claim, reported symptoms, and other information of record).

The issue of entitlement to service connection for a skin condition is addressed in the REMAND portion of the decision below and is REMANDED to the Agency of Original Jurisdiction (AOJ).


FINDINGS OF FACT

1. The Veteran's current macular degeneration is not etiologically related to service, including exposure to herbicide agents during service, and is not related to or aggravated by his service-connected disabilities.

2. Symptoms of hypertension, bilateral knee arthritis, and low back arthritis were not chronic in service, were not continuous after service separation, and did not manifest to a compensable degree within one year of separation from service.

3. The Veteran's current hypertension, bilateral knee disability, and low back disability did not manifest during service and are not etiologically related to service, including exposure to herbicide agents, and not proximately due to, or aggravated by his service-connected disabilities.
 
4. For the entire rating period on appeal, the Veteran's diabetes has required oral medication, insulin injections, and a restricted diet, but has not required a regulation of activities.

5. For the entire period on appeal, the Veteran's onychomycosis did not involve more than five percent of either his entire body or the exposed area affected, and he did not use any intermittent systemic therapy such as corticosteroids or other immunosuppressive drugs.

6. For the entire period on appeal, the Veteran's bilateral cataracts have been either preoperative or postoperative with replacement lenses, and his corrected near and distance vision has been 20/40 or better bilaterally.

6. The Veteran's erectile dysfunction does not result in penile deformity.

7. Prior to January 24, 2013, the Veteran's cystoparesis was not characterized by urinary leakage or incontinence, a daytime voiding interval of less than one hour, or awakening to void five or more times per night.

8. From January 24, 2013, the Veteran's cystoparesis was characterized by urinary frequency with awakening to void five or more times per night, but was not characterized by urinary leakage or incontinence. 

9. Prior to August 31, 2013, the Veteran's right and left lower extremity peripheral neuropathies manifested in no worse than mild incomplete paralysis of the sciatic nerves.

10. From August 31, 2013, the Veteran's right and left lower extremity peripheral neuropathies manifested in moderate incomplete paralysis of the sciatic nerves; moderately severe incomplete paralysis of the sciatic nerves is not shown.

11. On May 30, 2006, the Veteran filed an original informal claim for service connection for diabetes. Prior to May 30, 2006, there is no evidence of a formal or informal claim of service connection for diabetes or any associated disability.

12. The Veteran's spouse does not have disabilities which render her unable to adequately attend to the needs of daily living without the regular assistance of another person or leave her unable to protect herself from the hazards and dangers inherent in her daily environment.


CONCLUSIONS OF LAW

1. The criteria for service connection for macular degeneration have not been met. 38 U.S.C. §§ 1110, 1131, 5107 (2012); 38 C.F.R. §§ 3.102, 3.303, 3.307, 3.310 (2017).

2. The criteria for service connection for hypertension have not been met. 38 U.S.C. §§ 1110, 1131, 5107 (2012); 38 C.F.R. §§ 3.102, 3.303, 3.307, 3.309, 3.310 (2017).

3. The criteria for service connection for a right knee disability have not been met. 38 U.S.C. §§ 1110, 1131, 5107 (2012); 38 C.F.R. §§ 3.102, 3.303, 3.307, 3.309, 3.310 (2017).

4. The criteria for service connection for a left knee disability have not been met. 38 U.S.C. §§ 1110, 1131, 5107 (2012); 38 C.F.R. §§ 3.102, 3.303, 3.307, 3.309, 3.310 (2017).

5. The criteria for service connection for a low back disability have not been met. 38 U.S.C. §§ 1110, 1131, 5107 (2012); 38 C.F.R. §§ 3.102, 3.303, 3.307, 3.309, 3.310 (2017).

6. The criteria for an initial rating in excess of 20 percent for diabetes mellitus, type II, have not been met. 38 U.S.C. §§ 1155, 5107 (2012); 38 C.F.R. §§ 1155, 5107 (2012); 38 C.F.R. §§ 3.102, 4.1, 4.3, 4.7, 4.119, Diagnostic Code (DC) 7913.

7. The criteria for an initial compensable rating for onychomycosis have not been met. 38 U.S.C. §§ 1155, 5107 (2012); 38 C.F.R. §§ 1155, 5107 (2012); 38 C.F.R. §§ 3.102, 4.1, 4.3, 4.7, 4.118, 4.119, DCs 7806, 7813, 7913.

8. The criteria for an initial compensable rating for bilateral cataracts have not been met. 38 U.S.C. §§ 1155, 5107 (2012); 38 C.F.R. §§ 1155, 5107 (2012); 38 C.F.R. §§ 3.102, 4.1, 4.3, 4.7, 4.79, 4.119, DCs 6027, 7913.

9. The criteria for an initial compensable rating for erectile dysfunction have not been met. 38 U.S.C. §§ 1155, 5107 (2012); 38 C.F.R. §§ 1155, 5107 (2012); 38 C.F.R. §§ 3.102, 4.1, 4.3, 4.7, 4.115b, 4.119, DCs 7522, 7913.

10. Prior to January 24, 2013, the criteria for an initial rating in excess of 30 percent for cystoparesis have not been met. 38 U.S.C. §§ 1155, 5107 (2012); 38 C.F.R. 
§§ 3.102, 4.1, 4.3, 4.7, 4.115, 4.115a, 4.115b, DC 7512 (2017).

11. From January 24, 2013, the criteria for rating of 40 percent, but no higher, for cystoparesis have been met. 38 U.S.C. §§ 1155, 5107 (2012); 38 C.F.R. §§ 3.102, 4.1, 4.3, 4.7, 4.115, 4.115a, 4.115b, DC 7512 (2017).

12. Prior to August 31, 2013, the criteria for an initial rating in excess of 10 percent for right lower extremity peripheral neuropathy have not been met. 38 U.S.C. 
§§ 1155, 5107 (2012); 38 C.F.R. §§ 3.102, 4.1, 4.3, 4.7, 4.124a, DC 8520 (2017).

13. From August 31, 2013, the criteria for a rating of 20 percent, but no higher, for right lower extremity peripheral neuropathy have been met. 38 U.S.C. §§ 1155, 5107 (2012); 38 C.F.R. §§ 3.102, 4.1, 4.3, 4.7, 4.124a, DC 8520 (2017).

14. Prior to August 31, 2013, the criteria for an initial rating in excess of 10 percent for left lower extremity peripheral neuropathy have not been met. 38 U.S.C. 
§§ 1155, 5107 (2012); 38 C.F.R. §§ 3.102, 4.1, 4.3, 4.7, 4.124a, DC 8520 (2017).

15. From August 31, 2013, the criteria for a rating of 20 percent, but no higher, for left lower extremity peripheral neuropathy have been met. 38 U.S.C. §§ 1155, 5107 (2012); 38 C.F.R. §§ 3.102, 4.1, 4.3, 4.7, 4.124a, DC 8520 (2017).

16. The criteria for an effective date prior to May 30, 2006 for the award of service connection for diabetes have not been met. 38 U.S.C. § 5110 (2012); 38 C.F.R. 
§ 3.400.

17. The criteria for entitlement to SMC based on the need of the Veteran's spouse for A&A have not been met. 38 U.S.C. §§ 1115, 1502 (2012); 38 C.F.R. §§ 3.351, 3.352 (2017).


REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

Preliminary Matter

The Board has limited the discussion below to the relevant evidence required to support its finding of fact and conclusion of law, as well as to the specific contentions regarding the case as raised directly by the Veteran and those reasonably raised by the record. See Scott v. McDonald, 789 F.3d 1375, 1381 (Fed. Cir. 2015); Robinson v. Peake, 21 Vet. App. 545, 552 (2008); Dickens v. McDonald, 814 F.3d 1359, 1361 (Fed. Cir. 2016).


Service Connection - Laws and Regulations

Service connection may be granted for a disability resulting from a disease or injury incurred in or aggravated by active military, naval, or air service. 38 U.S.C. 
§§ 1110, 1131; 38 C.F.R. § 3.303(a). Service connection may also be granted for any disease diagnosed after discharge, when all the evidence, including that pertinent to service, establishes that the disease incurred in service. 38 C.F.R. 
§ 3.303(d). 

Establishing service connection generally requires (1) medical evidence of a current disability; (2) medical or, in certain circumstances, lay evidence of in-service incurrence or aggravation of a disease or injury; and (3) medical evidence of a nexus between the claimed in-service disease or injury and the present disability. Shedden v. Principi, 381 F.3d 1163, 1167 (Fed. Cir. 2004).

Service connection is also warranted for disability proximately due to or the result of a service-connected disease or injury. 38 C.F.R. § 3.310(a). Such secondary service connection is warranted for any increase in severity of a nonservice-connected disability that is proximately due to or the result of a service-connected disease or injury, and not due to the natural progress of the nonservice-connected disease. 38 C.F.R. § 3.310(b). Service connection based on aggravation caused by a service-connected disability is limited to situations when the baseline level of severity of the nonservice-connected disability is established by medical evidence created before the onset of aggravation or by the earliest medical evidence created at any time between the onset of aggravation and the receipt of medical evidence establishing the current level of severity of the nonservice-connected disease or injury. Id. 

The Veteran's diagnosed arthritis in the knees and back, as well as hypertension are considered by VA to be "chronic diseases" listed under 38 C.F.R. § 3.309(a); therefore, the presumptive service connection provisions based on "chronic" in-service symptoms and "continuous" post-service symptoms under 38 C.F.R. § 3.303 (b) apply. Walker v. Shinseki, 708 F.3d 1331 (Fed. Cir. 2013). Where the evidence shows a "chronic disease" in service or "continuity of symptoms" after service, the disease shall be presumed to have been incurred in service. Where there is a chronic disease shown as such in service or within the presumptive period under § 3.307 so as to permit a finding of service connection, subsequent manifestations of the same chronic disease at any later date, however remote, are service connected, unless clearly attributable to intercurrent causes. 38 C.F.R. § 3.303(b). This rule does not mean that any manifestation in service will permit service connection. For the showing of "chronic" disease in service, there is required a combination of manifestations sufficient to identify the disease entity, and sufficient observation to establish chronicity at the time. If a condition noted during service is not shown to be chronic, then generally, a showing of "continuity of symptoms" after service is required for service connection. 38 C.F.R. § 3.303(b).

Service connection may also be established with certain chronic diseases, including arthritis and hypertension, based upon a legal presumption by showing that the disorder manifested itself to a degree of 10 percent disabling or more within one year from the date of separation from active service. Such disease shall be presumed to have been incurred in service, even though there is no evidence of such disease during the period of active service. 38 U.S.C. §§ 1101, 1112, 1113, 1137; 38 C.F.R. §§ 3.307, 3.309(a). While the disease need not be diagnosed within the presumption period, it must be shown, by acceptable lay or medical evidence, that there were characteristic manifestations of the disease to the required degree during that time. As discussed below, the Veteran's arthritis and hypertension did not manifest within one year from the date of his separation from active service. Therefore, the one-year presumption does not apply.

VA regulations provide for presumptive service connection for specific diseases associated with exposure to herbicide agents. Those diseases that are listed at 38 C.F.R. § 3.309(e) shall be presumptively service-connected if there are circumstances establishing herbicide agent exposure during active military service, even though there is no record of such disease during service. Generally, the regulation applies where an enumerated disease becomes manifest to a degree of 10 percent or more at any time after service. 38 C.F.R. § 3.307(a)(6)(ii). While the Veteran is presumed to have been exposed to herbicide agents while serving in Korea, none of the conditions for which the Veteran is seeking service connection can be granted under 38 C.F.R. § 3.309(e) based on exposure to herbicide agents. VA has determined that there is no positive association between exposure to herbicide agents and any other condition for which it has not specifically determined a presumption of service connection is warranted. 61 Fed. Reg. 41,446 (1996); 59 Fed. Reg. 341 -46 (1994). Despite this, the Veteran is not precluded from establishing service connection with proof of actual direct causation. Combee v. Brown, 34 F.3d 1039, 1041-42 (Fed. Cir. 1994). However, as discussed below, the Veteran has not presented any medical evidence suggesting a nexus between his in-service herbicide agent exposure and the claimed conditions.

In rendering a decision on appeal, the Board must analyze the credibility and probative value of the evidence, account for the evidence which it finds to be persuasive or unpersuasive, and provide the reasons for its rejection of any material favorable to the claimant. Gabrielson v. Brown, 7 Vet. App. 36, 39-40 (1994); Gilbert v. Derwinski, 1 Vet. App. 49, 57 (1990). Competency of evidence differs from weight and credibility. Competency is a legal concept determining whether testimony may be heard and considered by the trier of fact, while credibility is a factual determination going to the probative value of the evidence to be made after the evidence has been admitted. Rucker v. Brown, 10 Vet. App. 67, 74 (1997); Layno v. Brown, 6 Vet. App. 465, 469 (1994). 

When considering whether lay evidence is competent, the Board must determine, on a case-by-case basis, whether a veteran's particular disability is the type of disability for which lay evidence may be competent. Kahana v. Shinseki, 24 Vet. App. 428 (2011); see also Jandreau v. Nicholson, 492 F.3d 1372, 1376-77 (Fed. Cir. 2007). A veteran is competent to report symptoms because this requires only personal knowledge, not medical expertise, as it comes to him through his senses. See Layno, 6 Vet. App. 465, 469. Lay testimony is competent to establish the presence of observable symptomatology, where the determination is not medical in nature and is capable of lay observation. Barr v. Nicholson, 21 Vet. App. 303 (2007). Lay evidence may establish a diagnosis of a simple medical condition, a contemporaneous medical diagnosis, or symptoms that later support a diagnosis by a medical professional. Jandreau, 492 F.3d 1372, 1377. 

When all the evidence is assembled, VA is responsible for determining whether the evidence supports the claim or is in relative equipoise, with a veteran prevailing in either event, or whether a preponderance of the evidence is against a claim, in which case, the claim is denied. 38 U.S.C. § 5107 (b); 38 C.F.R. § 3.102.


Service Connection Claim for Macular Degeneration - Analysis

The Veteran is seeking service connection for macular degeneration, including as secondary to exposure to herbicide agents and/or as secondary to, or aggravated by his service-connected disabilities.

As an initial matter, the medical evidence shows that the Veteran is currently diagnosed with macular degeneration. 

Turning to the evidence, the Veteran was afforded a VA eye conditions examination in April 2008. The Veteran was diagnosed with age-related macular degeneration (AMD). The VA examiner opined that the AMD was not caused by, or a result of, the service-connected diabetes, but no rationale was given.

The Veteran was afforded a VA eye conditions examination in November 2016. The VA examiner opined that it is less likely than not that the AMD was related to or caused by service, including exposure to herbicides. The VA examiner stated that while it is possible that some chemicals can cause certain eye conditions, there is no evidence in the records to support that herbicides caused the Veteran's AMD. The VA examiner stated that the AMD happened many years after service and it is more likely that it is related to other factors, such as the Veteran's age, high blood pressure, and years of smoking. The VA examiner also opined that the macular degeneration is less likely than not caused by the Veteran's service connected disabilities. The VA examiner explained that there is no medical evidence to support a connection between AMD and posttraumatic stress disorder (PTSD), peripheral neuropathy, cataracts, gastroparesis, or cystoparesis. In addition, the VA examiner stated that coronary artery disease will not directly trigger AMD, but it can influence the progression of AMD. The VA examiner also explained that while diabetes can affect the progression of AMD, it is more likely that the macular degeneration is attributable to other factors, such as the Veteran's age, high blood pressure, and years of smoking. Finally, the VA examiner opined that the Veteran's AMD was not at least as likely as not aggravated by the Veteran's service-connected disabilities, as there has been no measured vision loss since the AMD was first diagnosed in 2001, indicating little to no progression of the AMD. The Board finds this opinion to be adequate and highly probative, as it is based on an examination of the Veteran, a review of the Veteran's medical history, addressed all potential theories of entitlement, and was supported by detailed rationales. 

The Board finds that the weight of the evidence is against a finding that the Veteran's macular degeneration is etiologically related to service, including exposure to herbicide agents during service. In addition, the weight of the evidence indicates that the macular degeneration was not proximately due to, or aggravated by the service-connected disabilities. In support of these findings, the Board finds the November 2016 VA examiner's opinions to be highly probative, particularly as they are the only competent and probative nexus opinions of record. For these reasons, the Board finds that service connection for macular degeneration is not warranted. 

Insomuch as the Veteran has attempted to establish through his own lay assertions a nexus between his current macular degeneration and either service or his service-connected disabilities, the Board finds that the Veteran is not competent to provide such an etiology opinion due to the medical complexity of the matter. See Jandreau v. Nicholson, 492 F.3d 1372, 1377, n.4 (Fed. Cir. 2007) ("sometimes the layperson will be competent to identify the condition where the condition is simple, for example a broken leg, and sometimes not, for example, a form of cancer"). Thus, the Veteran is not competent to render an opinion as to etiology.
In summary, the Board finds that the weight of the evidence does not support an award of service connection for macular degeneration as this condition is not etiologically related service, including exposure to herbicide agents, is not etiologically related to the Veteran's service-connected disabilities, and has not been aggravated by the Veteran's service-connected disabilities. As the preponderance of the evidence is against the claim, the benefit of the doubt doctrine does not apply. 38 U.S.C. § 5107 (2012); 38 C.F.R. §§ 4.3, 4.7 (2017).


Service Connection Claim for Hypertension - Analysis

The Veteran is seeking service connection for hypertension, including as secondary to exposure to herbicide agents and as secondary to or aggravated by the service-connected disabilities.

As an initial matter, the Veteran has a current diagnosis of hypertension. See July 2008 VA treatment note.

Next, the Veteran indicated in his November 1969 Report of Medical History upon separation from service that he had high or low blood pressure. The Veteran's March 1968 induction examination indicated that his blood pressure was 120/72, and his November 1969 separation examination indicated that his blood pressure was 98/80. There are no other blood pressure readings of record from his period of active service. The Veteran's November 1969 blood pressure reading of 98/80 was consistent with his contemporaneous report of "high or low blood pressure," specifically that he had low blood pressure during service. For these reasons, the Board finds that the weight of the evidence supports a finding that the Veteran's current hypertension did not manifest during service, as he actually had low blood pressure during service.

Despite this finding that the Veteran's hypertension did not manifest during service, the Board will also consider whether service connection for hypertension is warranted based on other theories of entitlement that have been raised by the record.

Turning to the evidence, the Veteran was diagnosed with vascular hypertension in the August 1997 VA examination report.

The Veteran was afforded a VA diabetes examination in March 2008. The VA examiner opined that the Veteran's hypertension was not caused by or secondary to his diabetes. The VA examiner noted that the Veteran's hypertension preexisted his diabetes by many years and there was no evidence of nephropathy. The VA examiner stated that there was no evidence of aggravation of the Veteran's hypertension by his diabetes.

The Veteran was afforded a VA examination in September 2011. The VA examiner noted that the Veteran had a history of hypertension since about 1996. The VA examiner opined that the Veteran's essential hypertension was not a complication of diabetes because the condition preceded the onset of the diabetes. The VA examiner also opined that the hypertension was not worsened or increased by the Veteran's diabetes, because there was no vascular disease.

The Veteran was afforded a VA examination in November 2016. The VA examiner opined that it is not as least as likely as not that the Veteran's hypertension is etiologically due to service, including exposure to herbicides during service. The VA examiner also opined that it is not at least as likely as not that the Veteran's hypertension is proximately due to or aggravated by any of his service-connected disabilities. The VA examiner gave a detailed review of the relevant medical history, specifically noting the normal blood pressure readings during service and treatment for hypertension prior to the onset of diabetes mellitus and related conditions. The VA examiner also noted that a September 1997 VA examination indicated that the Veteran gained weight after smoking cessation in about 1984 with a weight of 265 pounds. The VA examiner stated that although the exact cause of essential hypertension is unknown, factors and conditions that may increase the risk of developing hypertension include increasing age, obesity, sedentary lifestyle, smoking, increased salt intake, heavy alcohol use, male gender, family history of hypertension, and African-American ethnicity. The VA examiner stated that risk factors identified in this Veteran include age, obesity, gender and genetics. The VA examiner opined that since the hypertension onset preceded the onset of the service-connected coronary artery disease (CAD), the CAD is unlikely to be the cause of the Veteran's hypertension and the medication to control the CAD is also used to control the hypertension. The VA examiner noted the 2015 echocardiogram and stated that the mild cardiac end-organ damage from hypertension would not support any significant aggravation of the hypertension. The VA examiner also noted that the Veteran's hypertension is controlled with routine oral medications. For these reasons, the VA examiner concluded that it is unlikely that the CAD has aggravated the hypertension condition to any degree. The VA examiner further stated that gastroesophageal reflux disease (GERD), gastroparesis, cataracts, and cystoparesis are not known causes of essential hypertension and developed after the onset of the hypertension condition. Therefore, they are an unlikely etiology for the hypertension

Next, the November 2016 VA examiner stated that the hypertension preceded the onset of the diabetes and there was no nephropathy. Therefore, the VA examiner concluded that it is unlikely that the diabetes has aggravated the hypertension. As to the service-connected PTSD, the VA examiner stated that while studies suggest a link between PTSD and cardiovascular health, there is no evidence that this association is causatory in the development of cardiovascular disease, including hypertension. Therefore, the VA examiner concluded that it is unlikely that the Veteran's PTSD caused the hypertension. The VA examiner stated that the PTSD is likely to improve with treatment and is unlikely to aggravate the hypertension. Furthermore, the VA examiner noted that the 2015 echocardiogram reflected only mild left ventricular hypertrophy and the Veteran's hypertension is controlled with routine oral medication, making it unlikely that the service-connected PTSD has aggravated the hypertension to any significant degree. The VA examiner also cited the Veteran's and Agent Orange Update 2014 in opining that, while there is some increasing association between Agent Orange exposure and hypertension development, there is still insufficient medical evidence to determine a causative association between essential hypertension and Agent Orange herbicide exposure. Therefore, the VA examiner concluded it is less likely that the hypertension is related to Agent Orange herbicide exposure. 

Based on a review of the evidence, both lay and medical, the Board finds the Veteran's hypertension did not manifest within one year after service and has not been continuous since service. As explained above, the Veteran's current hypertension did not manifest in service. The earliest medical evidence of record indicating a diagnosis or symptoms of hypertension is the August 1997 VA examination report, supporting a finding that the Veteran's hypertension did not manifest within one year of separation from service and has not been continuous since service. In addition, the Veteran has not reported that his hypertension manifested within one year of separation from active service. For these reasons, the weight of the evidence supports a finding that the Veteran's hypertension did not manifest within one year after separation from service and has not been continuous since service.

As explained above, hypertension is not a disease entitled to service connection based on exposure to herbicide agents. See 38 C.F.R. § 3.307, 3.309(e). However, as the Veteran contends that his current hypertension is related or caused by exposure to herbicides agents and he is presumed to have been exposed to such herbicide agents during service, the Board will consider whether service connection for hypertension is warranted based on direct causation. See Combee, 34 F.3d at 1041-42. The Veteran has not presented any medical evidence suggesting a nexus between his in-service herbicide agent exposure and his current hypertension. The only competent nexus opinion of record regarding the Veteran's exposure to herbicide agents is the negative nexus opinion from the November 2016 VA examiner. The VA examiner cited the Veteran's and Agent Orange Update 2014 in support of his opinion that it is less likely that the hypertension is related to exposure to herbicide agents. The November 2016 VA examiner explained that while there is some increasing association between Agent Orange exposure and hypertension development, there is still insufficient medical evidence to determine a causative association between essential hypertension and exposure to herbicide agents. The Board finds this opinion to be highly probative, as it includes a discussion of the relevant medical research and contains an adequate rationale to support the opinion. As the November 2016 VA examiner's negative nexus opinion is the only competent nexus opinion of record and is highly probative, the Board finds that service connection for hypertension is not warranted based on exposure to herbicide agents, including based on direct causation.

Finally, the Board finds that the Veteran's current hypertension was not caused or aggravated by the Veteran's service-connected disabilities. The March 2008, September 2011, and November 2016 VA examiners opined that the Veteran's current hypertension was not caused or aggravated by his service-connected diabetes. The VA examiners explained that the Veteran's hypertension preexisted his diabetes and there was no evidence of nephropathy or vascular disease, which would indicate aggravation of the hypertension by the diabetes. The November 2016 VA examiner also opined that since the hypertension onset preceded the onset of the service-connected CAD, the CAD is unlikely to be the cause of the Veteran's hypertension. The VA examiner further opined that the mild cardiac end-organ damage from hypertension, as indicated by the 2015 echocardiogram, would not support any significant aggravation of the hypertension by the service-connected CAD or PTSD. The VA examiner also noted that the Veteran's hypertension is controlled with routine oral medications. Therefore, the VA examiner concluded that the hypertension was not aggravated by the service-connected CAD. The VA examiner also stated that while studies suggest a link between PTSD and cardiovascular health, there is no evidence that this association is causatory in the development of cardiovascular disease, including hypertension. Therefore, the VA examiner concluded that it is unlikely that the PTSD caused the hypertension. Finally, the VA examiner opined that the Veteran's other service-connected disabilities, to include GERD, gastroparesis, cataracts, and cystoparesis, are unlikely etiologies for the hypertension, as they are not known causes of hypertension and developed after the onset of the current hypertension. The Board finds these medical opinions, particularly the November 2016 VA examiner's opinion, to be adequate and highly probative, as they are based on a detailed review of the Veteran's medical history and include detailed rationales to support the opinions. As these negative nexus opinions are the only competent and probative evidence of record, the Board finds that the preponderance of the evidence supports a finding that the Veteran's current hypertension is not caused or aggravated by his service-connected disabilities.

Insomuch as the Veteran has attempted to establish through his own lay assertions a nexus between his current hypertension and either service or his service-connected disabilities, the Board finds that the Veteran is not competent to provide such an etiology opinion due to the medical complexity of the matter. See Jandreau v. Nicholson, 492 F.3d 1372, 1377, n.4 (Fed. Cir. 2007) ("sometimes the layperson will be competent to identify the condition where the condition is simple, for example a broken leg, and sometimes not, for example, a form of cancer"). Thus, the Veteran is not competent to render an opinion as to etiology.

In summary, the Board finds that the weight of the evidence does not support an award of service connection for hypertension as this condition did not manifest during service or within one year after service, has not been continuous since service, is not related to exposure to herbicide agents, is not etiologically related to either service or the Veteran's service-connected disabilities, and has not been aggravated by the Veteran's service-connected disabilities. As the preponderance of the evidence is against the claim, the benefit of the doubt doctrine does not apply. 38 U.S.C. § 5107 (2012); 38 C.F.R. §§ 4.3, 4.7 (2017).


Service Connection Claim for Bilateral Knee Disabilities - Analysis

The Veteran is seeking service connection for bilateral knee disabilities. He contends that his current knee disabilities started during service and were continuously symptomatic after service.

As an initial matter, the Board finds that the Veteran had bilateral knee replacement surgeries. See December 2011 VA examination report. Therefore, the Veteran has current knee disabilities.

Next, the Veteran contends that his bilateral knee disability began during service. In his November 1969 Report of Medical History upon separation from service, the Veteran indicated, in pertinent part, that he had swollen or painful joints, cramps in his legs, and foot trouble. In April 1995, K.D., who served with the Veteran, stated that he recalled the Veteran having trouble with his knees during basic training. He stated that the Veteran complained of his knees giving way and losing control during marching, running exercises, and long periods of standing. In March 1998, G.C., who served with the Veteran, stated that the Veteran had almost constant knee pain during service. The Veteran had trouble marching, running, exercising, and standing for long periods of time. In June 2002, W.W., the Veteran's squad leader, stated that the Veteran had serious leg and knee problems during service. He stated that the training was really hard on the Veteran's legs and they were constantly running everywhere on pavement. The Board finds that these lay statements are competent lay evidence of pain and knee problems during service, as they are based on the witnesses' first-hand observations of the Veteran's impairment due to knee pain. Barr v. Nicholson, 21 Vet. App. 303 (2007). Therefore, resolving all reasonable doubt in the Veteran's favor, the Board finds that the Veteran had symptoms of a bilateral knee disability, including bilateral knee pain, during service.

Turning to the issue of etiology, in October 1995, the Veteran's treating physician from September 1983 to October 1989 stated that the Veteran twisted his left knee in November 1988 and was diagnosed with a possible tear of the left medial meniscus. He underwent arthroscopy of the left knee in December 1988 and was noted to have a tear of the medial meniscus and a large amount of hypertrophic synovitis. He had a moderate amount of arthritis changes in his knee at that time. 

The Veteran was afforded a VA examination in August 1997. He stated that he had no injuries or illnesses during service, but his knees bothered him because of the long marches and physical requirements of training. He stated that he want to sick call for this a number of times, but did not see a medical doctor about his knees until after service. The Veteran reported having left knee arthroscopic surgeries on his left knee in 1988 and 1989. He also reported having a right knee arthroscopic procedure in 1993. He had a right knee total knee replacement in December 1993.
In September 2002, the Veteran's former treating physician stated that the Veteran had been his patient from 1982 to 1989 and had bilateral knee problems at that time. The VA examiner noted that the Veteran was status post bilateral total knee replacement due to advanced degenerative joint disease. The VA examiner further noted that the Veteran did not seek medical attention for his knees until 1988. He was noted to be morbidly obese. The VA examiner opined that the severity of the Veteran's complaints was not borne out by the findings on the physical examination. The VA examiner further opined that most of the Veteran's pain and other complaints were due to his morbid exogenous obesity and chronic depression.

The Veteran was afforded a VA examination in September 2011. The VA examination report lists the date of onset for the Veteran's bilateral knee disabilities as the 1980's. The VA examiner opined that there was no injury or disease during service and the Veteran's bilateral knee disabilities occurred after service. The VA examiner further opined that the Veteran's bilateral knee disabilities were not related to or caused by the diabetes, as arthritis is not a known complication of diabetes. The VA examiner stated that the etiology of the bilateral knee disabilities appeared to have occurred after meniscal injuries.

The Veteran was afforded a VA examination in December 2011. The VA examiner opined that the Veteran's left knee disability was less likely than not related to his service-connected disabilities. The VA examiner noted that the Veteran was in receipt of service-connection for diabetes and bilateral onychomycosis. The VA examiner also stated that the Veteran's service treatment records showed no in-service left knee injury and the exit examination was normal for a knee condition. The VA examiner stated that a 1995 letter from the Veteran's private physician showed that the Veteran had an intercurrent left knee injury requiring two meniscal surgeries in 1988 and 1989, with degenerative joint disease noted at the time of the arthroscopic surgery. The Veteran reported that this was a workers compensation injury. The Veteran underwent a total knee joint replacement in 1992 for degenerative joint disease of the left knee. The VA examiner stated that degenerative arthritis is common after meniscal injury. The VA examiner further stated that the Veteran had no history of inflammatory or infections arthritis of the knee as expected if the onychomycotic condition were the cause of the degenerative joint disease. The VA examiner stated that diabetes is not known to cause arthritis. For these reasons, the VA examiner opined that it is less than likely that the left knee meniscal injury with subsequent degenerative joint disease requiring joint replacement is related to the service-connected onychomycosis or diabetes.

As to the right knee disability, the December 2011 VA examiner opined that this condition was less likely than not related to or caused by the Veteran's service-connected disabilities. The VA examiner again noted that the Veteran was in receipt of service connection for bilateral onychomycosis and diabetes. The VA examiner stated that the service treatment records showed no in-service right knee injury and the exit examination was normal for the knee condition. The VA examiner noted that the Veteran underwent a right knee arthroscopy for a meniscal injury in 1992 and 1993. The Veteran underwent a total knee joint replacement in 1992 for degenerative joint disease of the right knee, which the Veteran self-reported that the Workers Compensation Board ruled was due to overuse of the right knee secondary to the left knee injury. The VA examiner stated that the Veteran had no history of inflammatory or infectious arthritis of the knee as expected if the onychomycotic condition were the cause of the degenerative joint disease, and diabetes is not known to cause degenerative arthritis. For these reasons, the VA examiner opined that it is less than likely that the right knee degenerative joint disease requiring joint replacement is related to the service-connected diabetes or onychomycosis.

The November 2016 VA examiner opined that it was not at least as likely as not that the Veteran's bilateral knee condition was etiologically related to service, including exposure to herbicides. The VA examiner also opined that it was not at least as likely as not that the Veteran's bilateral knee condition was proximately due to or aggravated by any of his service-connected disabilities. The VA examiner noted that the March 1968 induction examination indicated a history of unspecified joint pain, but there were neither knee issues nor related abnormal physical examination findings to suggest a pre-existing condition. Service treatment records were silent for knee issues, complaints, diagnosis, or treatments. The Veteran's separation examination in November 1969 did not indicate knee issues or related abnormal physical examination findings to suggest a chronic or ongoing condition at military separation. The VA examiner gave a detailed history of the Veteran's knee injuries and treatment since service, as well as the Veteran's reports of ongoing intermittent knee pain after military separation. The VA examiner noted that the Veteran did not seek medical treatment for any knee issues from 1969 to 1988. The VA examiner also noted the lay statements from other veterans regarding the Veteran's knee condition symptoms during and after service. The VA examiner noted that the lay statements were not competent to establish an etiology of any knee pain. The VA examiner stated that knee osteoarthritis is a progressive degenerative joint disease that affects articular cartilage, bone, and synovium, and is the consequence of injury, inflammatory response, or direct wear and tear of aging on a joint. The VA examiner further stated that autopsies indicate evidence of osteoarthritis in weight-bearing joints of almost all persons by the age of 45 years. The VA examiner stated that arthritis consists of a joint cartilage loss, subchondral sclerosis, marginal osteophytes, and subchondral cysts. The VA examiner stated that it is common in joints having undergone abnormal stress from overuse or obesity. The VA examiner stated that the Veteran has obesity and his meniscal injury after service would support intercurrent trauma, especially since there are no bilateral knee traumatic events or treatments evidenced. The VA examiner noted that an increased Body Mass Index (BMI) is a clear risk factor for developing degenerative joint disease of the knees. Population-based studies have consistently shown a link between increased BMI and degenerative joint disease of the knees. In addition, long-term sequelae of meniscal injury include knee osteoarthritis in up to 60 percent of patients within 10 years. For these reasons, the VA examiner opined that the most likely etiology of the current bilateral knee degenerative joint disease is related to degenerative changes of aging, increased BMI, and likely the history of meniscal disease. The VA examiner further opined that the majority of medical literature does not support the Veteran's service-connected disabilities as causes of degenerative joint disease, and noted that the Veteran's knee degenerative joint disease with arthroplasty developed and occurred before the diagnosis or onset of his service-connected disabilities, making it highly unlikely that they are etiological causes of the bilateral knee degenerative joint disease. The VA examiner also stated that while the article submitted by the Veteran on bone and joint conditions associated with diabetes indicates that some rheumatic conditions can be associated or caused by long-term metabolic consequence of diabetes, the article does not mention knee degenerative joint disease. In addition, the VA examiner again noted that the Veteran's knee degenerative joint disease preceded the onset of the diabetes, and the article therefore would not support secondary causation of the knee conditions by the service-connected diabetes. Finally, the VA examiner opined that since degenerative joint disease is a progressive condition and since there have been no revisions to the knee prosthesis after the development of the service-connected disabilities, it is also highly unlikely that the Veteran's service-connected disabilities have aggravated either knee disability to any significant degree.
Based on a review of the evidence, both lay and medical, the Board finds that the Veteran's current bilateral knee disabilities are did not initially manifest during service, have not been continuous since service, and did not manifest within one year after service. While the Veteran contends that his bilateral knee symptoms began in service and have been continuous since service, the Board finds that the probative value of his lay statements regarding continuity of symptomatology have been outweighed by the competent and highly probative opinions from the December 2011 and November 2016 VA examiners, who stated that the Veteran's bilateral knee disabilities, specifically the arthritis that led to his total knee replacements, are at least as likely as not related to his meniscal injuries in the 1988, post-service weight gain, and the normal aging process, and are not etiologically related to service. While the Veteran is competent to report continuous symptoms of bilateral knee pain, he is not competent to opine that such pain is etiologically related to the bilateral degenerative joint disease that led to his bilateral total knee replacements, as this is a complex medical issue that goes beyond observable symptomatology. See Kahana v. Shinseki, 24 Vet. App. 428 (2011); see also Jandreau v. Nicholson, 492 F.3d 1372, 1376-77 (Fed. Cir. 2007); Clyburn v. West, 12 Vet. App. 296, 301 (1999) (holding that a veteran is not competent to relate currently diagnosed degenerative joint disease to the continuous post-service knee symptoms). In addition, the evidence clearly establishes that the Veteran's meniscal injuries were incurred in 1988, many years after service. For these reasons, the weight of the evidence supports a finding that the Veteran's current bilateral knee disabilities did not manifest during service or within one year after separation from service and have not been continuous since service. 
Next, the Board finds that the Veteran's current bilateral knee disabilities are not etiologically related to service. As explained above, the Veteran is not competent to opine on the etiology of his bilateral knee disabilities; thus, his opinion has no probative value. Therefore, the only competent nexus opinions regarding whether the Veteran's current bilateral knee disabilities are etiologically related to service are the negative nexus opinions from August 1997, September 2011, December 2011, and November 2016 VA examiners. In particular, the Board finds the opinions from the December 2011 and November 2016 VA examiners to be highly probative, as they are based on a detailed review of the record and contain detailed rationales to support the opinions. The December 2011 and November 2016 VA examiners stated that the Veteran's bilateral knee disabilities, specifically the arthritis that led to his total knee replacements, are at least as likely as not related to his meniscal injuries in the 1988, post-service weight gain, and the normal aging process, and are not etiologically related to service. Both VA examiners also noted that no complaints of or treatments for knee conditions are noted in the Veteran's service treatment records or separation examination. In addition, the September 2011 VA examiner opined that the etiology of the bilateral knee disabilities appeared to have occurred after the meniscal injuries in the 1980s. As these are the only competent nexus opinions of record, the Board finds that the weight of the evidence supports a finding that the Veteran's current bilateral knee disabilities are not etiologically related to service. 

Finally, the Board finds that the Veteran's current bilateral knee disabilities are not related to, caused by, or aggravated by his service-connected disabilities. The December 2011 and November 2016 VA examiners opined that the bilateral knee disabilities are less likely than not related to his service-connected diabetes, as the onset of the bilateral knee disabilities preceded the onset of diabetes, and there was no evidence of aggravation of the bilateral knee disabilities by the diabetes. The Board finds these opinions to be both competent and highly probative. As these negative nexus opinions are the only competent and probative evidence of record, the Board finds that the preponderance of the evidence supports a finding that the Veteran's current bilateral knee disabilities are not etiologically related to or aggravated by the Veteran's service-connected disabilities 

In summary, the Board finds that the weight of the evidence does not support awards of service connection for left and right knee disabilities as the bilateral knee degenerative joint disease and meniscal injuries that led to the bilateral knee replacements did not manifest during service or within one year after service, have not been continuous since service, are not etiologically related to either service or the Veteran's service-connected disabilities, and have not been aggravated by the Veteran's service-connected disabilities. As the preponderance of the evidence is against the claims, the benefit of the doubt doctrine does not apply. 38 U.S.C. 
§ 5107 (2012); 38 C.F.R. §§ 4.3, 4.7 (2017).


Service Connection Claim for a Low Back Disability - Analysis

The Veteran contends that his current low back disability is related to or caused by service. In the alternative, he contends that his low back disability is related to or aggravated by his service-connected disabilities.

As an initial matter, the Veteran has current diagnoses of lumbar spine arthritis and degenerative disc disease. 

Turning to the evidence, in his November 1969 Report of Medical History upon separation from service, the Veteran indicated, in pertinent part, that he had swollen or painful joints. However, neither his service treatment records nor his November 1969 separation examination indicated any complaints of or treatment for any sort of back disability or symptoms.

During the August 1997 VA examination, the Veteran reported having low back pain that started in 1991. The VA examiner opined that the severity of the Veteran's complaints was not borne out by the findings on the physical examination. The VA examiner further opined that most of the Veteran's pain and other complaints were due to his morbid exogenous obesity and chronic depression.

An August 1997 VA x-ray report indicated that the Veteran had scoliosis with degenerative bony spurring.

The Veteran was afforded a VA examination in December 2011. The VA examiner noted a diagnosis of lumbago during service that was characterized as a transient condition. A current diagnosis of lumbar spondylosis with degenerative disc disease was also noted. The VA examiner stated that the Veteran was diagnosed with arthritis of the lumbar spine by a 2001 x-ray report. The Veteran reported continual back pain with intermittent anterior right leg numbness, diagnosed as meralgia paresthestica. The VA examiner opined that the Veteran's current low back disability was less likely than not incurred in or caused by service. The VA examiner noted that the Veteran's service treatment records indicate that he had a history of low back pain with a normal examination in March 1968. There was also a normal examination of the back in November 1969. The VA examiner stated that there was a widespread pattern of degenerative joint disease throughout the Veteran's body. Therefore, the VA examiner opined that it is less than likely that the current lumbar back condition diagnosed about 30 years after service is related to or aggravated by the in-service back complaint. Instead, the current back disability is more than likely related to the normal aging process. The VA examiner stated that spondylosis is a natural process of aging, noting that it is seen in 10 percent of individuals by the age of 25 years and in 95 percent by the age of 65 years.

The Veteran was afforded a VA examination in December 2013. No nexus opinion was given. 

In May 2014, a VA physician opined that it is less likely than not that the Veteran's current degenerative back condition is related to service. The VA physician stated that the Veteran's separation examination documented no on-going back complaints. Therefore, the VA physician opined that the Veteran's arthritis was likely related to the aging process. 

The November 2016 VA examiner opined that it is not as least as likely as not that the Veteran's low back disability is etiologically due to service, including exposure to herbicides, or etiologically related to or aggravated by his service-connected disabilities. The VA examiner noted that the Veteran's March 1968 induction examination indicated a history of unexplained back issues, but no related abnormal physical examination findings to suggest a pre-existing lumbar spine condition. The Veteran's service treatment records were silent for back issues, complaints, diagnosis, or treatments. The VA examiner also stated that the Veteran's separation examination in November 1969 indicated neither lumbar spine issues nor related abnormal physical examination findings to suggest a chronic or ongoing lumbar spine condition at the time of military separation. The VA examiner noted an August 1997 diagnosis of degenerative arthritis spurring and minor degenerative disc disease of the lumbar spine. The VA examiner stated that spondylosis, or degenerative changes in the intervertebral discs are an inevitable result of aging, and are influenced by major and minor mechanical stresses, including injury to the spine. The VA examiner also stated that degenerative joint disease of the spine is a chronic condition that tends to progressively worsen over time with the natural aging process and/or due to repetitive injury. The VA examiner opined that the majority of medical literature does not support that the Veteran's service-connected conditions are causes or lead to the development of spinal spondylosis. The VA examiner noted that an article submitted by the Veteran on bone and joint conditions associated with diabetes indicated that some rheumatic conditions can be associated or caused by long-term metabolic consequence of diabetes, but the article did not mention spondylosis. The VA examiner stated that the Veteran's spondylosis preceded the onset of the diabetes and therefore the article would not support secondary causation of the back condition by the diabetes. The VA examiner stated that acute spinal pain or lumbago resulted from trauma causing stretching or tearing of muscles, tendons, ligaments, or fascia, but no the vertebrae or discs. Therefore, the VA examiner concluded that acute spinal pain or lumbago during service is unlikely to be the cause of the Veteran's degenerative disc disease or degenerative joint disease, which is more than likely related to ongoing repetitive injury. The VA examiner further stated that the radiographic changes in this Veteran are most consistent with degenerative changes of aging involving the entire spine. The VA examiner opined that since spondylosis is a progressive condition, and since there has been no surgical intervention, with the symptoms being controlled with medication and intermittent epidural steroid injections, it is also highly unlikely that the Veteran's service-connected conditions have aggravated the lumbar spine to any significant degree. 

Based on a review of the evidence, both lay and medical, the Board finds that the Veteran's current low back disabilities did not manifest during service or within one year of separation from service and the symptoms of the low back disability have not been continuous since service. In support of this finding, the Board notes that the Veteran reported during the August 1997 VA examination that his low back pain started in 1991. The record indicates that the first diagnosis of a low back disability was in August 1997, when an x-ray report indicated that the Veteran had scoliosis with degenerative bony spurring. Therefore, the Board finds that the weight of the evidence supports a finding that service connection for the low back disability is not warranted based on either manifestation to a compensable degree within one year or continuous symptoms since separation from service. 

In addition, the Board finds that the Veteran's current low back disability is not related to or caused by service. This finding is supported by the competent and highly probative negative nexus opinions from the December 2011 and November 2016 VA examiners, who both opined that the Veteran's low back disability was not related to service and was instead etiologically related to the normal aging process, based on the lack of documented in-service back problems and the passage of many years between the Veteran's separation from service and the diagnosis of a low back disability. In addition, the November 2016 VA examiner opined that the radiographic changes in this Veteran are most consistent with degenerative changes of aging involving the entire spine. These negative nexus opinions are the only competent nexus opinions of record; therefore, they are highly probative. For these reasons, the Board finds that the weight of the evidence supports a finding that the Veteran's current low back disability is not etiologically related to service.

Finally, the Board finds that the Veteran's current low back disability is not caused or aggravated by his service-connected diabetes. This finding is supported by the negative nexus opinion from the November 2016 VA examiner, who stated that the majority of medical literature does not support that the Veteran's service-connected diabetes is a cause of or leads to the development of spinal spondylosis. The VA examiner accurately stated that the article submitted by the Veteran did not mention spondylosis. Furthermore, the VA examiner opined that since the Veteran's spondylosis preceded the onset of the diabetes, the article would not support secondary causation of the back condition by the diabetes. Finally, the VA examiner opined that since spondylosis is a progressive condition, and since there has been no surgical intervention, with the symptoms being controlled with medical and intermittent epidural steroid injections, it is also highly unlikely that the Veteran's service-connected disabilities have aggravated the lumbar spine conditions to any significant degree. The Board finds these opinions from the November 2016 VA examiner to be adequate and highly probative, as they include a detailed history, consider the Veteran's lay contentions and the articles he submitted, and include detailed rationales. As to the internet articles and other research the Veteran submitted to support his assertions, the Board finds that their probative value is outweighed by the detailed opinions of the VA examiners. In short, the articles and other research submitted by the Veteran are general in nature and do not relate to the specific facts of his claim. Further, while these articles, taken together, highlight an increased risk for bone and joint problems in patients with diabetes, they do not establish that the Veteran's service-connected diabetes caused or aggravated his low back disabilities. Moreover, the articles are not combined with an opinion of a medical professional. Therefore, this evidence is less probative than the detailed opinions from the VA examiners, regarding the etiology of the Veteran's current low back disabilities. For these reasons, the Board finds that the weight of the evidence supports a finding that the Veteran's current low back disability is not etiologically related to or aggravated by his service-connected diabetes.

In summary, the Board finds that the weight of the evidence does not support an award of service connection for a low back disability, as the low back disability did not manifest during service or within one year after service, has not been productive of continuous symptoms since service, is not etiologically related to either service or the Veteran's service-connected diabetes, and has not been aggravated by the Veteran's service-connected diabetes. As the preponderance of the evidence is against the claim, the benefit of the doubt doctrine does not apply. 38 U.S.C. § 5107 (2012); 38 C.F.R. §§ 4.3, 4.7 (2017).


Increased Initial Rating Claims - Laws and Regulations 

Disability ratings are determined by applying the criteria set forth in VA's Schedule for Rating Disabilities. The percentage ratings are based on the average impairment of earning capacity and individual disabilities are assigned separate diagnostic codes. 38 U.S.C. § 1155 (2012); 38 C.F.R. § 4.1 (2017). 

The Veteran's entire history is to be considered when making disability evaluations. See generally 38 C.F.R. § 4.1 (2017); Schafrath v. Derwinski, 1 Vet. App. 589 (1995). Staged ratings are appropriate for any rating claim when the factual findings show distinct time periods during the appeal period where the service-connected disability exhibits symptoms that would warrant different ratings. Hart v. Mansfield, 21 Vet. App. 505 (2007). Staged ratings are appropriate for any initial rating claim when the factual findings show distinct time periods during the appeal period where the service-connected disability exhibits symptoms that would warrant different ratings. Fenderson v. West, 12 Vet. App. 119, 126 (1999).

Where there is a question as to which of two evaluations shall be applied, the higher evaluation will be assigned if the disability picture more nearly approximates the criteria for that rating. Otherwise, the lower rating will be assigned. 38 C.F.R. 
§ 4.7 (2017). Any reasonable doubt regarding a degree of disability will be resolved in favor of the veteran. 38 C.F.R. § 4.3 (2017). 

The assignment of a particular diagnostic code is "completely dependent on the facts of a particular case." Butts v. Brown, 5 Vet. App. 532, 538 (1993). One diagnostic code may be more appropriate than another based on such factors as an individual's relevant medical history, the diagnosis, and demonstrated symptomatology. Any change in a diagnostic code by a VA adjudicator must be specifically explained. Pernorio v. Derwinski, 2 Vet. App. 625, 629 (1992).

In rendering a decision on appeal, the Board must analyze the credibility and probative value of the evidence, account for the evidence which it finds to be persuasive or unpersuasive, and provide the reasons for its rejection of any material favorable to the claimant. Gabrielson v. Brown, 7 Vet. App. 36, 39-40 (1994); Gilbert v. Derwinski, 1 Vet. App. 49, 57 (1990). Competency of evidence differs from weight and credibility. Competency is a legal concept determining whether testimony may be heard and considered by the trier of fact, while credibility is a factual determination going to the probative value of the evidence to be made after the evidence has been admitted. Rucker v. Brown, 10 Vet. App. 67, 74 (1997); Layno v. Brown, 6 Vet. App. 465, 469 (1994). 

When considering whether lay evidence is competent, the Board must determine, on a case-by-case basis, whether a veteran's particular disability is the type of disability for which lay evidence may be competent. Kahana v. Shinseki, 24 Vet. App. 428 (2011); see also Jandreau v. Nicholson, 492 F.3d 1372, 1376-77 (Fed. Cir. 2007). A veteran is competent to report symptoms because this requires only personal knowledge, not medical expertise, as it comes to him through his senses. See Layno, 6 Vet. App. 465, 469. Lay testimony is competent to establish the presence of observable symptomatology, where the determination is not medical in nature and is capable of lay observation. Barr v. Nicholson, 21 Vet. App. 303 (2007). Lay evidence may establish a diagnosis of a simple medical condition, a contemporaneous medical diagnosis, or symptoms that later support a diagnosis by a medical professional. Jandreau, 492 F.3d 1372, 1377. 

When all the evidence is assembled, VA is responsible for determining whether the evidence supports the claim or is in relative equipoise, with a veteran prevailing in either event, or whether a preponderance of the evidence is against a claim, in which case, the claim is denied. 38 U.S.C. § 5107(b) (2012); 38 C.F.R. § 3.102 (2017).


Increased Initial Rating Claim for Diabetes - Analysis

The Veteran is in receipt of a 20 percent initial rating for diabetes under 38 C.F.R. 
§ 4.119, DC 7913, applicable to diabetes mellitus. The Veteran contends that his diabetes is worse than contemplated by the disability rating currently assigned, and asserts that an increased rating is warranted for the entire period on appeal.

Pursuant to DC 7913, diabetes mellitus requiring insulin and restricted diet, or; oral hypoglycemic agent and restricted diet is assigned the current-20 percent rating. Diabetes mellitus requiring insulin, restricted diet, and regulation of activities is assigned a 40 percent rating. A rating of 60 percent is assigned when diabetes mellitus requires insulin, restricted diet, and regulation of activities with episodes of ketoacidosis or hypoglycemic reactions requiring one or two hospitalizations per year or twice a month visits to a diabetic care provider, plus complications that would not be compensable if separately evaluated. Diabetes mellitus requiring more than one daily injection of insulin, restricted diet, and regulation of activities (avoidance of strenuous occupational and recreational activities) with episodes of ketoacidosis or hypoglycemic reactions requiring at least three hospitalizations per year or weekly visits to a diabetic care provider, plus either progressive loss of weight and strength or complications that would be compensable if separately evaluated, is assigned a 100 percent rating. 

The term "regulation of activities" is defined in the rating criteria for a 100 percent disability rating under DC 7913 as "avoidance of strenuous occupational and recreational activities." Although not specified in the rating criteria, the Board finds that this definition also applies to the "regulation of activities" discussed in the 40 percent and 60 percent disability ratings under DC 7913. Additionally, medical evidence is required to show that occupational and recreational activities have been restricted. See Camacho v. Nicholson, 21 Vet. App. 360, 363-64 (2007). 

Further, in light of the conjunctive "and" in the criteria for a 40 percent disability rating under DC 7913, all criteria must be met to establish entitlement to a 40 percent rating. See, e.g., Heuer v. Brown, 7 Vet. App. 379, 385 (1995) (holding that criteria expressed in the conjunctive are connected by "and"); Malone v. Gober, 10 Vet. App. 539 (1997) (construing "and" as conjunctive in a statute); cf. Johnson v. Brown, 7 Vet. App. 95, 97 (1994) (holding that "or" in the rating criteria shows that each is an independent basis for granting that rating).

Based on the evidence of record, both lay and medical, a rating in excess of 20 percent has not been met for any period on appeal, as the competent medical evidence of record does not show that the Veteran's diabetes requires regulation of activities.

The Veteran was afforded a VA examination in March 2008. The VA examiner stated that the Veteran had not had frequent ketoacidosis or hypoglycemic reactions. The Veteran had never been hospitalized for ketoacidosis or hypoglycemic reactions. He was on a diabetic diet. He did not have any restrictions of activities on account of diabetes. He saw a diabetic care provider about every six months. 

The Veteran was afforded a VA examination in September 2011. The Veteran reported taking daily oral medications and insulin. He had not been hospitalized nor had emergency room visits due to his diabetes. The VA examiner stated that the Veteran was not restricted in his ability to perform strenuous activities. There were no episodes of hypoglycemia reactions or ketoacidosis. The VA examiner diagnosed the Veteran with diabetes-related nephropathy. 

The Veteran was afforded a VA examination in January 2013. The VA examiner stated that the onset of diabetes was in 2005. The Veteran had been prescribed oral hypoglycemic agents and one insulin injection per day. The Veteran did not require regulation of activities as part of the medical management of his diabetes. The Veteran visited his diabetic care provider for episodes of ketoacidosis or hypoglycemic reactions less than two times per month and had not been hospitalized for episodes of ketoacidosis over the past 12 months. The Veteran had two episodes of hypoglycemia requiring hospitalization over the past 12 months. The Veteran had not had progressive unintentional weight loss or loss of strength attributable to diabetes. The Veteran reported having stinging and sticking sensation in his feet and legs, as well as some numbness in his hands. The VA examiner stated that this was very typical of diabetic neuropathy and onset was one year after the diagnosis of diabetes. The VA examiner stated that the Veteran's diabetes impacted his ability to work. The Veteran was a truck driver and the Department of Transportation would not allow a truck driver to be on insulin. The Veteran also reported that his feet would get numb after driving for a while, which the VA examiner stated would make it unsafe for the Veteran to continue as a driver even if he were not on insulin.

The Veteran was afforded a VA examination in April 2015. His diabetes was managed by a restricted diet, prescribed oral hypoglycemic agents, and prescribed insulin more than one injection per day. The Veteran did not require regulation of activities as part of the medical management of diabetes. He visited his diabetic care provider for episodes of ketoacidosis or hypoglycemic reactions less than two times per month. He had no hospitalizations for episodes of ketoacidosis or hypoglycemic reactions in the past 12 months. He had no progressive unintentional weight loss attributable to diabetes. However, the Veteran had progressive loss of strength attributable to diabetes, with a loss of half his strength over the prior two years. The diabetes made him weak and fatigued.

The Veteran was afforded a VA examination in December 2016. His diabetes was managed by a restricted diet, he had been prescribed oral hypoglycemic agent(s), and insulin was required with more than one injection per day. There was no significant weight loss. There were no emergency room visits or hospitalizations in the last year for the diabetes condition. There was no treatment for hypoglycemic episodes. The Veteran visited his diabetic care provider two to three times per year. The VA examiner stated that the Veteran did not require regulation of activities as part of medical management of his diabetes. The VA examiner also stated that labs began to consistently show elevated microalbuminuria starting in August 2009, with current normal BUN and creatinine. The functional impact of the Veteran's diabetes was that he required frequent breaks and a private place with facilities for hand-washing and the disposal of glucose testing strips. Limitations may be placed on continuous physical exertion, working in extreme temperature or moist areas, working at unprotected heights, and working in isolated areas alone. The VA examiner noted that as the disease progresses and is associated with visual or sensory impairment, work requiring visual acuity, fine dexterity, prolonged walking, or heavy labor may need to be limited. There were no effects on the Veteran's activities of daily living. 

Upon review of all the evidence of record, lay and medical, the Veteran has not met all the criteria for the 40 percent rating under DC 7913, as he has not been shown to require regulation of activities due to diabetes. As such, a rating in excess of 20 percent is not warranted. The preponderance of the evidence is against the claim for an increased rating and there is no doubt to be resolved, therefore, the appeal is denied.

As to complications associated with the Veteran's diabetes disability, the Board will address those issues separately in the following sections. 

Neither the Veteran nor his representative has raised any other issues, nor have any other issues been reasonably raised by the record. See Doucette v. Shulkin, 28 Vet. App. 366, 69-70 (2017) (confirming that the Board is not required to address issues unless they are specifically raised by the claimant or reasonably raised by the evidence of record).


Initial Compensable Rating Claim for Onychomycosis - Analysis

The Veteran's onychomycosis is currently rated as part of his service-connected diabetes mellitus under 38 C.F.R § 4.119, DC 7913, applicable to diabetes mellitus. He contends that a separate compensable rating is warranted. 

38 C.F.R. § 4.118, DC 7813 is applicable to dermatophytosis, or onychomycosis, and, therefore, is the appropriate diagnostic code under which to rate the Veteran's onychomycosis. DC 7813 provides that the disability should be rated based on the predominant disability as disfigurement of the head, face, or neck under DC 7800; as scars under DCs 7801-7805; or as dermatitis under DC 7806. Id. 

As discussed below, the Veteran's onychomycosis does not involve disfigurement of the head, face, or neck; therefore, DC 7800 does not apply. In addition, there is no scarring associated with the onychomycosis; therefore, DCs 7801-7805 do not apply.

Under DC 7806, a noncompensable disability rating is assigned where there is involvement of less than five percent of the entire body or less than five percent of exposed areas affected, and; no more than topical therapy required for treatment during the past 12-month period. A 10 percent disability rating is assigned where there is involvement of at least five percent, but less than 20 percent, of the entire body, or at least five percent, but less than 20 percent, of exposed areas affected, or; intermittent systemic therapy such as corticosteroids or other immunosuppressive drugs required for a total duration of less than six weeks during the past 12-month period. A 30 percent disability rating is assigned for involvement of 20 to 40 percent of the entire body or 20 to 40 percent of exposed areas affected, or; systemic therapy such as corticosteroids or other immunosuppressive drugs required for a total duration of six weeks or more, but not constantly, during the past 12-month period. A 60 percent disability rating is assigned for involvement of more than 40 percent of the entire body or more than 40 percent of exposed areas affected, or; constant or near constant systemic therapy such as corticosteroids or other immunosuppressive drugs required during the past 12-month period. A disability under DC 7806 may also be rated as disfigurement of the head, face, or neck (DC 7800), or scars (DCs 7801-7805) depending on the predominant disability; however, as discussed above, DCs 7800-7805 are not applicable here.

Turning to the evidence, in October 2008, the Veteran stated that his feet itched on a daily basis. He reported that his feet also peeled. He could only wear shoes for a short period of time because of the discomfort. This was around his toes and the arches of both feet. He stated that this was a different problem than his neuropathy, which was characterized by numbness and stinging.

The Veteran was afforded a VA examination in October 2009. The VA examiner stated that the Veteran had no onychomycosis on any exposed area of the body such as the head, face, neck or hands. Onychomycosis affected three percent of the surface area of the entire body. There was no scarring or disfigurement. Microalbuminuria on more than one occasion was noted.

A March 2016 VA podiatry treatment note indicated that the Veteran had current onychomycosis. He had hyperpigmentation of the bilateral foot and ankle.

The Veteran was afforded a VA examination in December 2016. The VA examiner noted that the Veteran was not on medication for toe nail infection. The Veteran had a recurrent ingrown toe nail. He had not been treated with oral or topical medications in the past 12 months for any skin condition. The Veteran's right great toe nail was absent. The VA examiner stated that no current onychomycosis was noted.

Based on a review of the record, both lay and medical, the Board finds that a separate compensable rating is not warranted for onychomycosis, for the entire period on appeal. Throughout the period on appeal, the evidence does not indicate that the onychomycosis involved more than five percent of either the entire body or the exposed area affected, as is required for a compensable rating under DC 7806. In addition, the evidence does not indicate that the Veteran has received anything other than topical therapy at any point during the period on appeal. There is no evidence of any use of intermittent systemic therapy such as corticosteroids or other immunosuppressive drugs. To the contrary, the December 2016 VA examiner specifically stated that the Veteran did not have any current onychomycosis and had not been treated with oral or topical medications in the past 12 months for any skin condition. For these reasons, the weight of the evidence supports a finding that a separate compensable rating for onychomycosis is not warranted throughout the period on appeal.

Neither the Veteran nor his representative has raised any other issues, nor have any other issues been reasonably raised by the record. See Doucette v. Shulkin, 28 Vet. App. 366, 69-70 (2017) (confirming that the Board is not required to address issues unless they are specifically raised by the claimant or reasonably raised by the evidence of record).


Increased Initial Rating Claim for a Bilateral Cataracts Disability - Analysis

The Veteran's bilateral cataract disability is currently rated as part of his service-connected diabetes mellitus under 38 C.F.R § 4.119, DC 7913, applicable to diabetes mellitus. He contends that a separate compensable rating is warranted. 

38 C.F.R. § 4.79, DC 6027 is applicable to cataracts of any type, and therefore, is the appropriate diagnostic code under which to rate the Veteran's disability. DC 6027 provides that preoperative cataracts should be evaluated based on visual impairment. For postoperative cataracts, DC 6027 provides that if a replacement lens is present (pseudophakia), evaluated based on visual impairment. If there is no replacement lens, evaluate based on aphakia. As the evidence indicates that throughout the period on appeal the bilateral cataracts were either preoperative or postoperative with a replacement lens, the bilateral cataract disability is rated based on visual impairment. Id.; see also November 2016 VA examination report.

Eye disabilities with visual impairment are rated based on impairment in visual acuity with correction. See 38 C.F.R. §§ 4.75, 4.76. Impairment of central visual acuity warrants a zero percent, or noncompensable, rating when the vision in both eyes is 20/40 (6/12) or better. 38 C.F.R. § 4.79, DC 6066. A ten percent rating is provided for vision in one eye of 20/50 (6/15) and vision in the other of 20/40 (6/12) or 20/50 (6/15) or vision in one eye of 20/70 (6/21) or 20/100 (6/30) with vision in the other of 20/40 (6/12). Id.

Turning to the evidence, the Veteran was afforded a VA examination in October 2011. He was diagnosed with cataracts, dry eyes, and dry age-related macular degeneration. Corrected distance visual acuity was 20/40 or better bilaterally and corrected near visual acuity was 20/40 or better bilaterally. The Veteran did not have a difference equal to two or more lines on the Snellen test type chart or its equivalent between distance and near corrected vision, with the near vision being worse. The Veteran's pupils were round and reactive to light, with no afferent pupillary defect. The Veteran did not have anatomical loss, light perception only, extremely poor vision, or blindness of either eye. He did not have diplopia or a corneal irregularity that resulted in severe irregular astigmatism. The Veteran did not have a visual field defect. The Veteran's bilateral cataracts were preoperative and there was no aphakia. The VA examiner opined that the Veteran's decrease in visual acuity was related to his cataracts and age-related macular degeneration. The VA examiner further opined that the Veteran's bilateral cataracts did not impact his ability to work.

The Veteran was afforded a VA examination in November 2016. A diagnosis of a history of bilateral cataract extraction was noted. Uncorrected distance visual acuity was 20/70 in the right eye and 20/40 or better in the left eye. Uncorrected near visual acuity was 20/50 bilaterally. Both corrected distance and near visual acuity were 20/40 or better bilaterally. The Veteran did not have a difference equal to two or more lines on the Snellen test type chart or its equivalent between distance and near corrected vision, with the near vision being worse. Pupils were round and reactive to light. Bilateral pseudophakia was noted. A visual field defect was noted. The VA examiner stated that the Veteran's bilateral cataracts were postoperative, with bilateral replacement intraocular lenses. There was no aphakia. The VA examiner opined that the Veteran's decrease in visual acuity was not attributable to his bilateral cataract condition. The VA examiner noted that the Veteran's right cataract was removed in December 2013 and his left cataract was removed in August 2015. Pseudophakia was present in the right eye and attributed to the treatment for cataracts. The Veteran had preproliferative diabetes mellitus with macular edema in the right eye greater than the left eye. 

Based on a review of the evidence, both lay and medical, the Board finds that a compensable rating for a bilateral cataract disability is not warranted for the entire period on appeal. Both the October 2011 and November 2016 VA examination reports indicated that the Veteran's bilateral corrected visual acuity was 20/40 or better for both near and distance vision. Therefore, the weight of the evidence supports a finding that a separate compensable rating for a bilateral cataract disability is not warranted for the entire period on appeal. 

Neither the Veteran nor his representative has raised any other issues, nor have any other issues been reasonably raised by the record. See Doucette v. Shulkin, 28 Vet. App. 366, 69-70 (2017) (confirming that the Board is not required to address issues unless they are specifically raised by the claimant or reasonably raised by the evidence of record).


Increased Initial Rating Claim for Erectile Dysfunction - Analysis

The Veteran's erectile dysfunction is currently included as part of his 20 percent rating for diabetes mellitus under DC 7913. He contends that a separate compensable rating is warranted. 

As an initial matter, the Board notes that the Veteran is currently receiving special monthly compensation (SMC) based on loss of use of a creative organ as a result of the Veteran's erectile dysfunction associated with the service-connected diabetes. SMC was granted effective March 30, 2006, which is the same as the effective date for the award of service connection for erectile dysfunction.

Erectile dysfunction is properly evaluated under DC 7522. DC 7522 provides a 20 percent rating for a deformity of the penis with loss of erectile power. 38 C.F.R. 
§ 4.115b, DC 7522. The rating schedule authorizes the assignment of a 0 percent (noncompensable) rating in every instance in which the rating schedule does not provide for such a rating and the requirements for a compensable rating are not met. 38 C.F.R. § 4.31. A footnote to this diagnostic code indicates that claims for penis deformities should be reviewed for entitlement to SMC. See 38 U.S.C. §§ 1114(k) (2012); 38 C.F.R. § 3.350(k) (2017). SMC is payable for anatomical loss or loss of use of a creative organ. Id. 

Here, a compensable rating for erectile dysfunction is not warranted. Although the Veteran has loss of erectile power, the medical evidence does not reflect a penile deformity. The September 2011 VA examination report indicated that a physical examination of the Veteran's penis was normal. While the December 2016 VA examination report indicated that the Veteran had abnormal epididymis bilaterally, the VA examiner opined that this was due to unrelated epididymal cysts. In addition, while the December 2016 VA examiner noted that the Veteran had an enlarged prostate, any symptoms related to this condition are already considered by the rating for the Veteran's service-connected cystoparesis and no further discussion is required.

The remaining evidence of record shows that the Veteran had incomplete erections without treatment and was not currently receiving treatment. He could not achieve climax or ejaculation. He had previously been treated with sildenafil. See December 2016 VA examination report. However, loss of erectile power is not the same as a penile deformity as contemplated under DC 7522. 

The Board finds that there is no other provision of the code that would afford the Veteran a compensable evaluation for his erectile dysfunction. It is noted that the Veteran is receiving a separate rating for voiding dysfunction and there is no evidence of any other potentially ratable symptoms. See generally 38 C.F.R. 
§ 115a. Further, the Veteran has already been granted SMC for loss of use of a creative organ.

Accordingly, the claim for entitlement to an initial compensable rating for erectile dysfunction is denied. As the evidence of record is not roughly in equipoise, there is no doubt to resolve. 38 U.S.C. § 5107 (2012); 38 C.F.R. § 3.102.

Neither the Veteran nor his representative has raised any other issues, nor have any other issues been reasonably raised by the record. See Doucette v. Shulkin, 28 Vet. App. 366, 69-70 (2017) (confirming that the Board is not required to address issues unless they are specifically raised by the claimant or reasonably raised by the evidence of record).


Increased Initial Rating Claim for Cystoparesis - Analysis

The Veteran is in receipt of a 30 percent initial rating for cystoparesis prior to December 7, 2016, and a 40 percent rating thereafter. The Veteran's cystoparesis is rated under 38 C.F.R. § 4.115b, DC 7512, applicable to chronic cystitis. The Veteran contends that his cystoparesis is worse than contemplated by the disability ratings currently assigned, and asserts that increased ratings are warranted for the entire period on appeal.

DC 7512 provides that manifestations of the disability should be rated as voiding dysfunction. 

Voiding dysfunction is evaluated under 38 C.F.R. § 4.115a, which provides that any voiding dysfunction shall be rated by the particular condition as urine leakage, urinary frequency, or obstructive voiding. Furthermore, where diagnostic codes refer the decisionmaker to specific areas of dysfunction, only the predominant area of dysfunction shall be considered for rating purposes. Id. 

Under urine leakage conditions (continual urine leakage, post-surgical urinary diversion, urinary incontinence, or stress incontinence), a 60 percent disability rating requires the use of an appliance or the wearing of absorbent materials which must be changed more than four times per day. A 40 percent disability rating requires the wearing of absorbent materials which must be changed two to four times per day. A 20 percent disability rating requires the wearing of absorbent materials which must be changed less than two times per day. 38 C.F.R. § 4.115a.

Under urinary frequency conditions, a 40 percent disability rating requires a daytime voiding interval of less than one hour, or awakening to void five or more times per night. A 20 percent disability rating requires a daytime voiding interval between one and two hours, or awakening to void three to four times per night. A 10 percent disability rating requires a daytime voiding interval between two and three hours, or awakening to void two times per night. 38 C.F.R. § 4.115a.

Under obstructed voiding conditions, a 30 percent disability rating requires urinary retention requiring intermittent or continuous catheterization. A 10 percent disability rating requires marked obstructive symptomatology (hesitancy, slow or weak stream, decreased force of stream) with any one or combination of the following: (1) post void residuals greater than 150 cc; (2) uroflowmetry demonstrating markedly diminished peak flow rate (less than 10 cc/sec); (3) recurrent urinary tract infections secondary to obstruction; or (4) stricture disease requiring periodic dilation every two to three months. A noncompensable disability rating requires obstructive symptomatology with or without stricture disease requiring dilation one to two times per year. 38 C.F.R. § 4.115a.

Turning to the evidence, a May 2007 VA Agent Orange Registry examination report indicated that the Veteran reported voiding six to 10 times per day and three to four times per night. He had problems with hesitancy. 

A December 2008 VA urology treatment note indicated that the Veteran reported having increasing difficulty with voiding, with increased hesitancy, straining, post-void dribbling, and feelings of incomplete emptying. The Veteran reported urgency with associated incontinence if he could not make it to the bathroom on time. He stated that all of these symptoms had been gradually worsening over the past four to five months. The Veteran had an indwelling (continuous) catheter inserted.

A January 2009 VA urology treatment note indicated that the Veteran would attempt to control his voiding dysfunction conservatively with timed voidings (every four hours while awake). 

A December 2009 VA urology treatment note indicated that the Veteran reported voiding with nocturia three times per night. The Veteran was taught to use self-intermittent catheter.

In February 2010, the Veteran's representative reported that the Veteran was "now on a catheter four times per day." This was confirmed by the Veteran in June 2010, when he stated that he used a catheter four times a day. 

The Veteran was afforded a VA examination in September 2011. The Veteran required self-catherization to void. The Veteran reported performing self-catherization six times per day. The Veteran's daytime voiding interval was one to two hours and he reported four voidings per night. The Veteran's creatinine was 108.9 mg/dL on the day of the examination. The VA examiner noted that in July 2010 the Veteran's creatinine was 132.6 mg/dL. The VA examiner also noted that in February 2010 the Veteran's creatinine was 163.3 mg/dL. The VA examiner noted that the cystoparesis had a mild effect on the Veteran's ability to do chores and travel and a moderate effect on his toileting ability. 

A January 2013 VA urology treatment note indicated that the Veteran complained of nocturia four to five times per night. 

A June 2014 VA urology treatment record indicated that the Veteran self-catheterized five times daily for bladder relief. He had bloody urinary incontinence on his clothing. He had nocturia every one and a half hours. 

A February 2016 VA treatment note indicated that the Veteran had symptoms of incomplete bladder emptying, increased frequency, intermittent urgency, weak stream, straining, and nocturia, treated with self-intermittent catherization for four years, and problems passing catheters. He reported blood during passage in September 2015. 

The Veteran was afforded a VA examination in December 2016. The VA examiner noted that the Veteran had a cystoscopy in August 2016 which revealed gross hematuria, benign enlargement of the prostate, and incomplete bladder emptying. Creatinine was 1.23 mg/dL, BUN/creatinine was 11.7 L, and albumin was 3.4 g/dL. February 2016 testing indicated that microalbumin-random was less than 970 mg/L and creatinine was 275.5 mg/dL. January 2015 testing indicated that microalbumin-random was 932 mg/L and urine creatinine was 168.3 mg/dL. The voiding dysfunction did not cause urine leakage. The VA examiner stated that the voiding dysfunction required the use of an appliance, specifically intermittent self-catherization. The Veteran had a daytime voiding interval between two and three hours, and nighttime awakening to void five or more times. The Veteran had symptoms of obstructive voiding, including marked hesitancy, a markedly slow stream, a markedly weak stream, a markedly decreased force of stream, and urinary retention requiring intermittent catheterization. There were no other obstructive symptoms.

Based on a review of the evidence, both lay and medical, the Board finds that the Veteran does not have urine leakage. See December 2016 VA examination report. Therefore, no further discussion of a rating based on urine leakage or incontinence, included as requiring the use of an appliance, is warranted. 

The evidence indicates that, for the entire period on appeal, the Veteran's predominant areas of dysfunction have been urinary frequency and obstructed voiding. The Veteran has been in receipt of at least a 30 percent rating, the maximum possible rating based on obstructed voiding, for the entire period on appeal. Therefore, no further discussion of the rating criteria based on obstructed voiding is warranted. The only remaining applicable rating criteria are those based on urinary frequency. 

Prior to January 24, 2013, the Board finds that a rating in excess of 30 percent for cystoparesis is not warranted. The evidence consistently reflects that prior to January 24, 2013, the Veteran's daytime voiding interval was greater than one hour and he awakened to void less than five times per night. Therefore, the criteria for a rating in excess of 30 percent based on urinary frequency have not been met. For these reasons, a rating in excess of 30 percent for cystoparesis prior to January 24, 2013 is not warranted.

From January 24, 2013, the Board finds that a 40 percent rating, but no higher, is warranted for cystoparesis based on urinary frequency. The January 2013 and June 2014 VA treatment notes, as well as the December 2016 VA examination report, indicated that the Veteran had nocturia at least five times per night. This is consistent with the criteria for a 40 percent rating based on urinary frequency, which is the maximum schedular rating based on urinary frequency. For the reasons discussed above, a rating in excess of 40 percent based on voiding dysfunction is not warranted. 

In summary, the Board finds that a rating in excess of 30 percent for cystoparesis is not warranted prior to January 24, 2013. However, a rating of 40 percent, but no higher, is warranted for cystoparesis from January 24, 2013.

Neither the Veteran nor his representative has raised any other issues, nor have any other issues been reasonably raised by the record. See Doucette v. Shulkin, 28 Vet. App. 366, 69-70 (2017) (confirming that the Board is not required to address issues unless they are specifically raised by the claimant or reasonably raised by the evidence of record).



Increased Initial Rating Claim for 
Peripheral Neuropathy of the Bilateral Lower Extremities - Analysis

The Veteran is in receipt of a 10 percent initial rating for bilateral lower extremity peripheral neuropathy prior to April 22, 2015, and a 20 percent rating thereafter. 

His bilateral lower extremity peripheral neuropathy is currently rated under 38 C.F.R. § 4.124a, DC 8526, applicable to paralysis of the anterior crural (femoral) nerve. The Veteran contends that his bilateral lower extremity peripheral neuropathy is worse than contemplated by the disability ratings currently assigned, and asserts that increased ratings are warranted for the entire period on appeal.

As noted above, the Veteran's bilateral lower extremity peripheral neuropathy is currently rated under DC 8526 for paralysis of the anterior crural (femoral) nerve. While the April 2015 VA examination report indicated that the Veteran's bilateral lower extremity peripheral neuropathy involved paralysis of the femoral nerve, the January 2013 and December 2016 VA examination reports both indicated that the Veteran's bilateral lower extremity peripheral neuropathy involved paralysis of the sciatic nerves. 

The Board notes that higher ratings are available under DC 8520 (maximum available rating of 80 percent), applicable to paralysis of the sciatic nerve, than are available under DC 8526 (maximum available rating of 40 percent), applicable to paralysis of the anterior crural (femoral) nerve. For these reasons, the Board finds that the evidence supports a finding that the Veteran's bilateral lower extremity peripheral neuropathy is more accurately rated under DC 8520, and there is no prejudice to the Veteran in this change in the applicable diagnostic code

Under DC 8520, an 80 percent disability rating is assigned for complete paralysis of the sciatic nerve, demonstrated by foot drop, no active movement possible of the muscles below the knee, and knee flexion that is weakened or (very rarely) lost. Lower disability ratings are provided for incomplete paralysis, defined by the Rating Schedule as "a degree of lost or impaired function substantially less than the type picture for complete paralysis given." A 60 percent disability rating is assigned for severe, incomplete paralysis, with marked muscular atrophy. A 40 percent disability rating is assigned for moderately severe, incomplete paralysis. A 20 percent disability rating is assigned for moderate, incomplete paralysis. A 10 percent disability rating is assigned for mild, incomplete paralysis. 38 C.F.R. 
§ 4.124a, DC 8520.

The words "mild," "moderate," and "severe" are not defined in the Rating Schedule. Rather than applying a mechanical formula, the Board must evaluate all of the evidence to the end that its decisions are "equitable and just." 38 C.F.R. § 4.6. It should also be noted that use of terminology such as "mild" and "moderate" by VA examiners or other physicians, although an element of evidence to be considered by the Board, is not dispositive of an issue. All evidence must be evaluated in arriving at a decision regarding an increased rating. 38 C.F.R. §§ 4.2, 4.6.

Turning to the evidence, a November 2005 VA neurology treatment note indicated that the Veteran complained of numbness on the plantar aspect of both feet. This had been going on for several months. 

The Veteran was afforded a VA diabetes examination in March 2008. The VA examiner stated that the Veteran had normal monofilament sensation, vibratory sensation, and position sense of the toes.

A December 2008 VA treatment note indicated that the Veteran's bilateral lower extremity strength was normal and sensation was grossly intact. His bilateral lower extremity reflexes were hypoactive. He reported right leg numbness.

The Veteran was afforded a VA examination in September 2011. He described the peripheral neuropathy symptoms as "sticking" and cold paresthesias in both feet. The Veteran's gait was antalgic, with poor propulsion. The detailed reflex examination was normal, except for a decreased right knee jerk. Bilateral lower extremity sensory examination was normal. The detailed motor examination was normal bilaterally. Muscle tone was normal and there was no muscle atrophy.

The Veteran was afforded a VA spine examination in December 2011. A diagnosis of restless leg syndrome was noted. The Veteran reported mild numbness and paresthesias/dysesthesias in the right lower extremity. Muscle strength was normal and there was no muscle atrophy. Reflex and sensory examinations were normal. There were no trophic changes. The VA examiner opined that the Veteran's peripheral neuropathy did not impact his ability to work. The Veteran was employed as a truck driver. 

The Veteran was afforded a VA examination in January 2013. The Veteran had symptoms of moderate bilateral lower extremity paresthesias and/or dysesthesias and mild bilateral lower extremity numbness. He had no symptoms of constant pain or intermittent pain of the bilateral lower extremities. Strength and deep tendon reflex testing was normal. The Veteran had decreased sensation to light touch in the left foot/toes, but sensory testing was otherwise normal. There was no muscle atrophy or trophic changes. The VA examiner opined that the Veteran had mild incomplete paralysis of the left sciatic nerve, but stated that there was no objective evidence to support a diagnosis of right lower extremity diabetic neuropathy.

The Veteran was afforded a VA foot examination in August 2013. He complained of pain in the soles of his feet that was sharp, tingling, and burning. This pain started about 2000 and was worse when he was on his feet. The VA examiner noted a December 2012 VA electromyogram (EMG) report indicating that the Veteran had small fiber neuropathy characterized by numbness and burning of the toes. The VA examiner stated that the Veteran should avoid prolonged standing, walking, climbing stairs, and ladders. The VA examiner further noted that the Veteran was a retired diesel mechanic and had retired one year ago due to diabetes. The Veteran had trouble bending to put his shoes on, but was otherwise able to attend to all activities of daily living. 

An October 2013 VA treatment note indicated that the Veteran had diminished sensation to pinprick testing on the plantar surfaces of both feet. He reported bilateral foot pain.

A March 2014 VA treatment note indicated that the Veteran stated that "both of my feet feel like they are in a bed of coals."

In October 2014, the Veteran stated that he had "extreme neuropathy" in both feet, with no feeling in his right foot. 

The Veteran was afforded a diabetic sensory-motor peripheral neuropathy examination in April 2015. The VA examiner stated that the Veteran's bilateral lower extremity diabetic neuropathy was diagnosed in 2007. The Veteran reported tingling and numbness in his toes and feet, as well as soreness in the feet. He had moderate bilateral lower extremity constant pain and numbness, but no intermittent pain or paresthesias/dysesthesias. Muscle strength and deep tendon reflexes testing was normal bilaterally. The Veteran had decreased sensation bilaterally to light touch/monofilament testing. Position sense was normal, but vibration sensation and cold sensation were both decreased bilaterally. The Veteran did not have muscle atrophy or trophic changes. The VA examiner opined that the Veteran had bilateral moderate incomplete paralysis of the femoral nerve. The functional impact of this disability was that pain in the Veteran's feet prevented prolonged standing.

An August 2015 VA neurology treatment note indicated that the Veteran had numbness and cramps in his legs. He had an unsteady gait, but reported no falls. His bilateral lower extremity muscle strength was normal. Sensation testing was normal. The Romberg test was normal, but he had some swaying during the test. His plantar reflexes were diminished bilaterally.

A March 2016 VA podiatry treatment note indicated that the Veteran had no hair growth on the bilateral feet. He had decreased sensation to sharp and dull sensations bilaterally. 

The Veteran was afforded a VA examination in December 2016. He had decreased sensory vibration in the right great toe, but all sensory, reflex, and motor testing was otherwise normal bilaterally. There was no bilateral lower extremity atrophy or trophic changes. The Veteran reported symptoms of pain, burning, and stinging in both feet. The symptoms were worse at night. The Veteran had symptoms of mild bilateral lower extremity constant pain, intermittent pain, and paresthesias and/or dysesthesias, but no numbness bilaterally. The VA examiner opined that the Veteran had mild bilateral incomplete paralysis of the sciatic nerve.

Based on a review of the evidence, both lay and medical, the Board finds that a rating in excess of 10 percent for right and left lower extremity peripheral neuropathies is not warranted prior to August 31, 2013. While the Veteran has consistently reported bilateral foot numbness, as well as paresthesias/dysesthesias starting in September 2011, sensory and muscle strength testing were consistently normal prior to the January 2013 VA examination. In addition, the reported numbness and paresthesias/dysesthesias were not reported to be more than mild in severity prior to January 2013. The January 2013 VA examination report reflected a worsening of the Veteran's peripheral neuropathy symptoms, with moderate bilateral lower extremity paresthesias and/or dysesthesias and decreased sensation in the left foot/toe, but these symptoms were solely sensory and the overall disability picture was no more than mild in light of the limited number of symptoms and the fact that only the paresthesias and/or dysesthesias was described as being of more than mild in severity. For these reasons, the Board finds that the Veteran's right and left lower extremity peripheral neuropathy was no more than mild prior to August 31, 2013. Therefore, a rating in excess of 10 percent for right and left lower extremity peripheral neuropathy is not warranted prior to August 31, 2013.

From August 31, 2013, a rating of 20 percent, but no higher, is warranted for right and left lower extremity peripheral neuropathy. The August 2013 VA examination report indicated that the Veteran had symptoms of burning, sharp pain, tingling, and numbness, and was the first report of specific functional impairments related to the bilateral lower extremity peripheral neuropathy. The VA examiner stated that the Veteran should avoid prolonged standing, walking, climbing stairs, and ladders. The Veteran also reported having trouble putting his shoes on. In October 2014, the Veteran described his bilateral lower extremity peripheral neuropathy as "extreme" and stated that he had no feeling in his right foot. However, the April 2014 VA examination report indicated that the Veteran's bilateral lower extremity pain and numbness were moderate, sensation was decreased, and muscle strength and deep tendon reflex testing were normal bilaterally. The April 2014 VA examiner opined that the Veteran's bilateral incomplete paralysis of the femoral nerve was moderate in severity, and the pain in his feet prevented prolonged standing. In addition, the December 2016 VA examination report indicated that the Veteran had decreased sensation in the right big toe, but all other sensory, reflex, and motor testing was normal bilaterally. The Veteran reported bilateral lower extremity symptoms of mild constant pain, intermittent pain, and paresthesias and/or dysesthesias, but no numbness. The December 2016 VA examiner opined that the Veteran's bilateral lower extremity peripheral neuropathy was mild in severity. For these reasons, the Board finds that the Veteran's bilateral lower extremity peripheral neuropathy was moderate in severity from August 30, 2013. Therefore, a rating of 20 percent, but no higher, for right and left lower extremity peripheral neuropathy is warranted from August 31, 2013.

In summary, the Board finds that an initial rating in excess of 10 percent for right and left lower extremity peripheral neuropathy is not warranted prior to August 31, 2013. However, a rating of 20 percent, but no higher, for right and left lower extremity peripheral neuropathy is warranted from August 31, 2013.

Neither the Veteran nor his representative has raised any other issues, nor have any other issues been reasonably raised by the record. See Doucette v. Shulkin, 28 Vet. App. 366, 69-70 (2017) (confirming that the Board is not required to address issues unless they are specifically raised by the claimant or reasonably raised by the evidence of record).

Earlier Effective Date Claim for Award of Service Connection for Diabetes

The effective date for an award of disability compensation based on an original claim for direct service connection, if the claim is received within one year after separation from service, shall be the day following separation from active service or the date entitlement arose; otherwise, and for reopened claims, it shall be the date of receipt of the claim, or the date entitlement arose, whichever is later. 38 U.S.C. 
§ 5110(a) (2012); 38 C.F.R. § 3.400 (2017). 

The terms claim and application mean a formal or informal communication in writing requesting a determination of entitlement or evidencing a belief in entitlement to a benefit. 38 C.F.R. § 3.1(p) (2017). Generally, the date of receipt of a claim is the date on which a claim, information, or evidence is received by VA. 38 C.F.R. § 3.1(r) (2017). A sympathetic reading as to all potential claims raised by the evidence is required. Szemraj v. Principi, 357 F.3d 1370 (Fed. Cir. 2004).

A specific claim in the form prescribed by the Secretary of VA must be filed in order for benefits to be paid to any individual under the laws administered by the VA. 38 U.S.C. § 5101(a) (2012). A claim is defined broadly to include a formal or informal communication in writing requesting a determination of entitlement or evidencing a belief in entitlement to a benefit. 38 C.F.R. § 3.1(p) (2017); Brannon v. West, 12 Vet. App. 32, 34-5 (1998); Servello v. Derwinski, 3 Vet. App. 196, 199 (1992). Any communication indicating intent to apply for a benefit under the laws administered by the VA may be considered an informal claim provided it identifies, but not necessarily with specificity, the benefit sought. See 38 C.F.R. § 3.155(a) (2017).

In this case, the RO assigned an effective date of May 30, 2006, for the grant of service connection diabetes; this date corresponds with the date the RO received the Veteran's statement which requested service connection for diabetes. 

The Board has reviewed all relevant evidence and finds no basis under the law to award an effective date earlier than May 30, 2006, for the grant of service connection for diabetes. There is nothing in the record prior to that date which could be construed as a claim for service connection for diabetes, even under the broadest definition of a claim. While the Veteran was diagnosed with diabetes in 2005, there is no evidence of such diagnosis prior to May 30, 2006. See April 2008 VA examination report. As such, the RO has already assigned the earliest possible effective date for its grant of the original informal claim, which was determined to be May 30, 2006. 

Consequently, there is no legal basis upon which to grant an effective date prior to May 30, 2006, for the grant of service connection for diabetes. The Board is bound by the law governing the assignment of effective dates in its determination in this case. See 38 U.S.C. § 7104(c). The claim of entitlement to an effective date earlier than May 30, 2006, for the award of service connection for diabetes must be denied.


SMC Based on the Veteran's Spouse's Need for A&A - Laws and Regulations

Any veteran who is entitled to disability compensation at the rates provided in 38 U.S.C. § 1114, whose disability is rated not less than 30 percent disabling, and whose spouse is a patient in a nursing home, or helpless or blind, or so nearly helpless or blind as to need or require the regular aid and attendance of another person, is entitled to additional compensation. 38 U.S.C. § 1115. The record shows that the Veteran has a disability rating of at least 80 percent throughout the period on appeal and meets the initial requirements for this provision.

VA's governing laws and regulations direct that special monthly compensation at the aid and attendance rate is payable to a Veteran by reason of the Veteran's spouse being helpless or so nearly helpless that he or she requires the regular aid and attendance of another person. 38 U.S.C. §§ 1502(b); 38 C.F.R. § 3.351(a), (b). 

To establish a need for regular aid and attendance, the Veteran's spouse must (1) be blind or so nearly blind as to have corrected visual acuity of 5/200 or less, in both eyes, or concentric contraction of the visual field to five degrees or less; (2) be a patient in a nursing home because of mental or physical incapacity; or (3) show a factual need for aid and attendance. 38 U.S.C. § 1502(b); 38 C.F.R. §§ 3.351(c).

Determinations as to a factual need for aid and attendance must be based on actual requirements of personal assistance from others. In making such determinations, consideration is given to such conditions as the inability to dress and undress, the inability to keep ordinarily clean and presentable, the inability to feed oneself through loss of coordination of the upper extremities or through extreme weakness, or the inability to attend to the wants of nature. It includes the frequent need of adjustment of any special prosthetic or orthopedic appliances which by reason of the particular disability cannot be done without aid. A need for aid and attendance also includes either physical or mental incapacity that requires care or assistance on a regular basis to protect against the hazards or dangers incident to the daily environment. Additionally, an individual who is bedridden, as that term is defined by regulation, meets the criteria for aid and attendance. 38 C.F.R. § 3.352(a). Bedridden is defined as a condition that, through its essential character, actually requires that the individual remain in bed. The fact that the Veteran's spouse has voluntarily taken to bed or that a physician has prescribed rest in bed for the greater or lesser part of the day to promote convalescence or cure will not suffice. 38 C.F.R. § 3.352(a).

The particular personal functions which the Veteran's spouse is unable to perform should be considered in connection with her condition as a whole. The evidence need only establish that she is so helpless as to need regular aid and attendance, not constant need. Determinations that she is so helpless as to need regular aid and attendance will not be based solely upon an opinion that her condition requires her to be in bed. They must be based on the actual requirement of personal assistance from others. 38 C.F.R. § 3.352(a). The Veteran's spouse must be unable to perform one of the enumerated personal functions, but her condition does not have to manifest in an inability to perform all the enumerated personal functions. Turco v. Brown, 9 Vet. App. 222, 224 (1996).


SMC Based on the Veteran's Spouse's Need for A&A - Analysis

The Veteran contends that he is entitled to SMC benefits on behalf of his spouse because she has debilitating conditions that require the aid and attendance of another person. Specifically, the Veteran and his spouse report that she has significant difficulties with ambulation and prolonged standing. They contend that as a result of these limitations, she requires the aid and attendance of another person on a daily basis.

In June 2010, the Veteran's spouse stated that she could not stand or sit for any length of time. She stated that she had a hip replacement surgery in October 2009, with a second hip surgery in November 2009. She had not been able to return to work since the surgery and need a cane and walker to get around.

The Veteran's spouse was afforded a VA examination in December 2016. She drove herself to the appointment with no assistance from any other persons. However, the VA examiner noted that she did not travel a lot due to her general arthralgias and weakness. The Veteran's spouse had severe degenerative joint disease of the bilateral hips and had a left hip replacement and revision. She walked with a J-cane and walker, and occasionally used a wheel chair for long distance travel. She used a cane and walker for all transfers due to weakness. She had dizziness less than weekly and mild (occasional) memory loss. The Veteran's spouse also had a history of long term hypertension. The VA examiner noted that the Veteran's spouse also had current diagnoses of bilateral patellofemoral degenerative joint disease, hiatal hernia and gastroesophageal reflux disease, minor dextroscoliosis, lumbar spondylosis, and hypothyroidism. She did not have to have assistance with her activities of daily living due to her inability to ambulate for long distances. During the examination, she had difficulty ambulating into the room and had a severely altered gait due to degenerative joint disease of the hip. She was able to perform all self-care functions. She was able to walk up to a few hundred yards without the assistance of another person, but required the use of a cane and/or walker. Function of the upper extremities was normal. Her propulsion was abnormal, with pelvic tilting due to severe degenerative joint disease and left hip replacement with failed prosthesis. The VA examiner stated that the Veteran's spouse was able to function without assistance with her activities of daily living, just at a slower rate and while sitting when she became tired. She was able to dress and undress herself, and keep herself ordinarily clean and presentable. The VA examiner opined that she did not suffer from physical or mental incapacity requiring assistance from another on a regular basis or to protect her from dangers of the environment. 

As she is neither blind nor nearly blind and is not a patient in a nursing home, the facts must establish that the Veteran's spouse is in need of aid and attendance in order to establish eligibility for SMC benefits. After a review of the evidence, both lay and medical, the Board finds that the Veteran's spouse does not have a factual need for aid and attendance. While the Veteran's spouse reported in June 2010 that she could not sit or stand for any length of time, she also stated that she could get around with the use of a cane and walker. She did not report any other functional impairment. The Board found the December 2016 VA examination report to be highly probative as to whether the Veteran's spouse has a factual need for aid and attendance. The Board found it to be highly probative that she drove herself to the December 2016 VA examination and did not have to have assistance with her activities of daily living and self-care functions, despite her severely altered gait and difficulty ambulating. While the evidence indicated that she functioned at a slower rate and while sitting when she became tired, this does not indicate that she has a factual need for aid and attendance. To the contrary, the evidence indicates that the Veteran's spouse is able to perform all activities of daily living despite her significant physical impairments. For these reasons, the Board finds that the weight of the evidence supports a finding that the Veteran's spouse does not have a factual need for aid and attendance; therefore, the SMC based on the Veteran's spouse's need for the regular aid and attendance of another is not warranted.

ORDER

Service connection for macular degeneration is denied.

Service connection for hypertension is denied.

Service connection for a right knee disability is denied.

Service connection for a left knee disability is denied.

Service connection for a low back disability is denied.

For the entire period on appeal, an initial rating in excess of 20 percent for diabetes mellitus, type II, is denied.

For the entire period on appeal, a separate compensable initial rating for onychomycosis, secondary to service-connected diabetes, is denied.

For the entire period on appeal, a separate initial compensable rating for bilateral cataracts, secondary to service connected diabetes, is denied.

For the entire period on appeal, a separate initial compensable rating for erectile dysfunction, secondary to service-connected diabetes, is denied.

Prior to January 24, 2013, an initial rating in excess of 30 percent for cystoparesis is denied.

From January 24, 2013, a rating of 40 percent, but no higher, for cystoparesis is granted, subject to the laws and regulations governing the payment of monetary benefits.

Prior to August 31, 2013, an initial rating in excess of 10 percent for right lower extremity peripheral neuropathy is denied.

From August 31, 2013, a rating of 20 percent, but no higher, for right lower extremity peripheral neuropathy is granted, subject to the laws and regulations governing the payment of monetary benefits.

Prior to August 31, 2013, an initial rating in excess of 10 percent for left lower extremity peripheral neuropathy is denied.

From August 31, 2013, a rating of 20 percent, but no higher, for left lower extremity peripheral neuropathy is granted, subject to the laws and regulations governing the payment of monetary benefits.

An effective date prior to May 30, 2006 for the award of service connection for diabetes is denied.

SMC based on the Veteran's spouse's need for A&A is denied.


REMAND

A remand is necessary in order to obtain adequate medical opinions regarding the etiology of the Veteran's skin conditions, including PFB.

In September 2017, the VA examiner opined that it is not at least as likely not that the current PFB is directly related to or incurred during service or was caused or aggravated by a service-connected disability. The VA examiner gave a detailed recitation of the relevant evidence. He opined that because PFB can be a temporary condition and there is no current or active PFB or facial scarring or hyperpigmentation of the skin consistent with a longstanding disease process, it is less than likely that any current PFB was incurred in or caused by treatment in service for PTSD. He stated that it would be a new and separate condition, most likely related to ongoing close trimming of the Veteran's beard. However, the September 2017 VA examiner's statement that the Veteran did not have facial scarring is contradicted by the November 2016 VA scars examination report, which indicated that the Veteran has painful scars of the face, trunk, and bilateral upper extremities, all of which are from PFB. 

Remand is required to clarify this inconsistency between the November 2016 VA examination report and the September 2017 VA medical opinion.

Accordingly, the case is REMANDED for the following action:

1. Obtain the Veteran's relevant VA treatment records dated since February 2017.

2. Schedule the Veteran for a VA examination to determine the etiology of the Veteran's diagnosed skin disorders. The entire claims file, including a copy of this Remand, should be made available to, and be reviewed by, the VA examiner.

For EACH diagnosed skin disorder (pseudofolliculitis barbae, stasis dermatitis, and seborrhea of the face), the VA examiner shall provide the following opinions:

(a) Whether it is at least as likely as not (50 percent probability or greater) related to or caused by service, to include exposure to herbicide agents during service.

(b) Whether it is at least as likely as not (50 percent probability or greater) proximately caused by, or aggravated by, any of the Veteran's service-connected disabilities (coronary artery disease, PTSD, diabetes mellitus type II, bilateral lower extremity peripheral neuropathy, cataracts, gastroparesis, and cystoparesis).

The VA examiner should acknowledge and discuss any lay evidence of chronicity of symptoms.

The examiner should provide a complete rationale (explanation based on medical knowledge and evidence of record) for all opinions expressed. 

If the examiner cannot provide an opinion without resorting to mere speculation, then he or she must so state, and must provide an explanation why an opinion would be speculative.

3. Thereafter, and after undertaking any additional development deemed necessary, readjudicate the issues on appeal. If the benefits sought on appeal remain denied, in whole or in part, the Veteran and his representative must be provided with a supplemental statement of the case and be afforded a reasonable opportunity to respond. The case should then be returned to the Board for further appellate review, if otherwise in order.

The Veteran has the right to submit additional evidence and argument on the matters the Board has remanded. Kutscherousky v. West, 12 Vet. App. 369 (1999).

This claim must be afforded expeditious treatment. The law requires that all claims that are remanded by the Board of Veterans' Appeals or by the United States Court of Appeals for Veterans Claims for additional development or other appropriate action must be handled in an expeditious manner. See 38 U.S.C. §§ 5109B, 7112 (2012).




______________________________________________
S. B. MAYS
Veterans Law Judge, Board of Veterans' Appeals

Department of Veterans Affairs